VON BAUMBACH, Collector of Internal Revenue, v. SARGENT LAND CO.

SAME v. SUTTON LAND CO. SAME v. KEARSARGE LAND CO.

(Circuit Court of Appeals. Eighth Circuit. December 9, 1914.)

Nos. 4081–4083.

*(Syllabus by the Court.)*

1. INTERNAL REVENUE ⚖9—CORPORATION TAX—"INCOME."

The owners of lands practically valuable only for the ore in them, years before January 1, 1909, when the Corporation Tax Act took effect, made mining leases thereof by which they granted the absolute right to dig and have the ore therein and to remove it within long terms, such as 25 and 50 years, and the lessees covenanted to pay yearly fixed amounts, such as 25 or 30 cents a ton for the ore extracted, and minimum yearly amounts to be credited on ores subsequently extracted in case sufficient amounts were not extracted to come to the minimums in any year. Thereafter, in the year 1906, these owners, for the purpose of collecting their claims against the lessees under their covenants to pay for the ores, and for the purpose of converting their property into money and distributing it among themselves, organized three corporations, conveyed these claims and the land to them in three lots, one lot to each corporation, and took from them therefor all the stock of these corporations in proportion to their undivided interests in the property. The corporations engaged in no mining, or trading, or other like business, but confined their operations to collecting the claims against the lessees, protecting and preserv-

⚖For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ing the property, converting it into money, and distributing the proceeds among its stockholders. In 1909, 1910, and 1911 the corporations collected the amounts which fell due in those years on the claims against the lessees under their covenants in the leases, which amounted to several hundred thousand dollars, and received some small amounts for the sale of some stumpage and a few town lots.

*Held*, the amounts thus received by the corporations were not included in "income," within the meaning of that word in the Corporation Tax Act, but were parts of the property or capital of the corporations in a different form.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 13–28; Dec. Dig. ☞9.

For other definitions, see Words and Phrases, First and Second Series, Income.]

**2. INTERNAL REVENUE ☞9—CORPORATION TAX—ALLOWANCE FOR DEPRECIATION.**

If the amounts collected by the corporations on the claims against the lessees under their covenants were income, then the property or capital of the corporations was reduced in amount and value by those amounts, and the corporations were entitled to an allowance thereof for the depreciation of their property.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 13–28; Dec. Dig. ☞9.]

**3. INTERNAL REVENUE ☞9—CORPORATION TAX—"DOING BUSINESS."**

Corporations that are the owners of property not engaged in business with themselves, that are engaged in no mining, trading, or other like business, but confine their operations to acts necessary or incidental to the protection and preservation of their property, to its conversion into money, and the distribution thereof among its stockholders, are not "doing business," within the meaning of the Corporation Tax Act, and are not subject to the tax it prescribes.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 13–28; Dec. Dig. ☞9.

For other definitions, see Words and Phrases, First and Second Series, Doing Business.]

**4. MINES AND MINERALS ☞62—MINING LEASES—SALES OF THE ORE.**

Mining leases, whereby the lessees are granted the absolute and exclusive right to extract and have the ore in the land and to remove it during terms, such as 25 and 50 years, so long as to be practically equivalent to unlimited times, are in reality sales of the ore, and the royalties reserved in the leases are in fact the purchase prices thereof.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 173, 175–180; Dec. Dig. ☞62.]

**5. APPEAL AND ERROR ☞854—GROUND FOR REVERSAL—ERRONEOUS REASON.**

A right judgment, which is warranted by the record and the facts, and was rendered without error in the trial or rendition, may not be reversed on the sole ground that the trial court gave a wrong reason for the just judgment.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3403, 3404, 3408–3424, 3427–3430; Dec. Dig. ☞854.]

*(Additional Syllabus by Editorial Staff.)*

**6. INTERNAL REVENUE ☞9—CORPORATION TAX—"INCOME."**

The word "income" is used in Corporation Tax Act of Aug. 5, 1909, c. 6, § 38, 36 Stat. 112 (Comp. St. 1913, §§ 6300–6307), in contradistinction to property and invested capital. It is not synonymous with the word "re-

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ceipts," and does not include receipts from the conversion, without profit, of the corporate property into money.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 13–28; Dec. Dig. ☞9.

For other definitions, see Words and Phrases, First and Second Series, Income.]

In Error to the District Court of the United States for the District of Minnesota; Charles A. Willard, Judge.

Action by the Sargent Land Company, a corporation, the Sutton Land Company, a corporation, and the Kearsarge Land Company, a corporation, against Fred Von Baumbach, Collector of Internal Revenue. Judgments for plaintiffs, and defendant brings error. Affirmed.

For opinion below, see 207 Fed. 423.

These writs of error are sued out to reverse judgments against the collector of internal revenue for the recovery of moneys which he exacted from the three corporations, plaintiffs below, over their protest as excise taxes for the years 1909, 1910, and 1911, under the corporation tax act of August 5, 1909 (36 Stat. 111, 112, c. 6, § 38). The court below found and held that the Commissioner had measured these taxes by the amounts of the receipts by the corporations of moneys derived by them from the conversion of parts of their respective properties or capitals into money, instead of by their receipts from their gains or incomes as required by the act.

Many years before that act was passed these corporations had become, and were at the time it went into effect, and during the years 1909, 1910, and 1911, the owners of lands on the Mesaba Range, which were valuable only for the iron ore in them beneath the surface, and of the rights to collect and receive the portions of the royalties on the ore which came due during those years under mining leases whereby the ore had all been granted to lessees prior to the year 1908 for fixed prices per ton of the ores extracted and yearly minimum amounts. The receipts of moneys during those years by which the Commissioner measured the taxes consisted of the payments of amounts of these royalties which came due during those years and of a few sums so small and insignificant as to be negligible in the discussion of the issues here for decision, which were received from the sale of a few town lots and lands and a little stumpage. From the sum of the receipts from these sources the Commissioner deducted nothing for depreciation of the plaintiffs' property or for conversion of parts of that property into money or for anything else except the expenses of the corporations, the taxes they paid, and the $5,000 specified by the act itself. For example, he found the receipts of the Sargent Company from the collection in 1909 of the royalties on the ores, the sales of lots and lands, and stumpage to be $395,732.90; from this amount he deducted only $5,458.83, the expenses of operating the corporation, and $540.38 taxes paid by it during the year and the $5,000 specified in the act, which left $384,733.69, and he caused 1 per cent. of this amount to be collected as the excise tax upon the corporation. The amounts collected of each of the companies for each of the years were measured and found on the same basis, and it is these amounts which the court below found that the companies were lawfully entitled to receive back.

The errors assigned are that the court should have found and held that the royalties received by the companies during the years 1909, 1910, and 1911 constituted gross income of the companies during those years, and that the Commissioner was authorized to collect 1 per cent. thereof, without any deduction for the depreciation of the property or capital by the collection of these royalties or the conversion of parts of their capital into money and the distribution of the proceeds to the stockholders of the companies. The facts material to the questions now at issue in this case are these:

The companies are not and never have been mining companies; they never have operated any mines in any way; they never made but one lease, and

the terms of that lease were agreed upon before the corporation lessor was organized, and after its organization it signed the legal contract on these terms. These corporations are and always have been mere owners of the rights to collect from the lessees the fixed amount per ton of ores mined by the lessees under leases made before the corporations were organized and of the lands leased whose only substantial value was the value of the ore therein. The origin of these corporations, the purpose of their organization and existence, and the character and extent of their operation are disclosed by the following facts:

In the years between 1870 and 1880, George A. Pillsbury, John S. Pillsbury, and Charles A. Pillsbury became the owners of immense tracts of timber land in Minnesota, from which they removed and sold the timber. John M. Longyear and Russell M. Bennett, about 1890, procured an option from them for such lands, exclusive of the timber thereon, as they might select on account of the ore therein. After exploration they selected the lands now held by the three companies, and pursuant to the contract for the option these lands were so deeded in 1892 that the parties above named thereby became the owners of the following undivided interests in them: Bennett, one-fourth; Longyear, one-fourth; J. S. Pillsbury, one-sixth; George A. Pillsbury, one-sixth; and Charles A. Pillsbury, one-sixth. By the year 1906 all three of the Pillsburys had died and their interests in this property had been devised or had descended to many parties, so that the interests of some of the owners were as small as $1/108$. The original parties and their successors in interest had made all the leases ever made on the property but one, and had agreed upon the terms of that one. It had become very difficult to get legal deeds or contracts from all of the owners, on account of the minority of some and the age and location of others. These owners were not operating mines, or doing anything with this property, but that which was necessary to sell it, convert it into money, and distribute the proceeds among themselves. The customary and the most beneficial way of converting into money land containing iron ore, which is without substantial value in the absence of the ore, is to sell the ore by means of a mining lease at a fixed price per ton, and it was for this purpose that the owners had made the leases of this property. These leases were for long terms, such as 25 years and 50 years, or an indeterminate term. By these leases the owners granted to the lessees the full and exclusive right to extract and have all the ore in the land described in the leases, and by them the lessees agreed to pay annually for the ore extracted fixed prices per ton, such as 25 cents per ton, or 30 cents per ton, and to pay specified minimum amounts annually. The parties agreed by the leases that each annual minimum payment should be credited to the lessees in payment of the ore subsequently extracted by them in case they did not extract in any year a quantity of ore sufficient to amount, at the contract rate, to the minimum payment. Thus it was that these numerous owners of undivided interests in the claims for the moneys which the lessees had covenanted by these leases to pay for the ore in these lands and of the lands themselves had become so numerous and were of such ages that it was impracticable for them to make legal contracts or conveyances, and were likely to become still more numerous.

Thereupon in the year 1906 they agreed to vest their ownership of these claims against the lessees and of the land, subject to the leases, in the three corporations, plaintiffs below, for the sole purpose of collecting these claims, which in reality constituted the only real value in all this property, and distributing the proceeds of the collections among themselves. They vested their ownership in three corporations, because the law of Minnesota prohibited any single or any two corporations from holding so many acres of land. They made the capital stock of each of the companies $108,000, although the value of the property they conveyed to each was much greater than that amount because the smallest part of the property owned by any one was $1/108$, and they issued all the stock to the owners of the property so that each one received as many thousands of dollars of the stock at par value as he owned $1/108$ths, and on July 19, 1906, they conveyed both their claims and rights to the moneys the lessees had covenanted to pay for

the ore, and the leased lands in three lots, one lot to each of the corporations.

The articles of incorporation of each company declared that the general nature of its business should be "the buying, owning, exploring, and developing, leasing, improving, selling, and dealing in lands, tenements, and hereditaments." But in December, 1909, these articles were amended in each case by substituting for that declaration this one: "The general purpose of the corporation is to unite · in one ownership the undivided fractional interests of its various stockholders in lands, tenements, and hereditaments, and to own such property, and, for the convenience of its stockholders, to receive and distribute among them, the proceeds of any disposition of such property at such times, in such amounts, and in such manner as the board of directors may determine." Neither of the three corporations has ever bought, explored, developed, leased, or improved any lands, tenements, or hereditaments, or dealt therein, except that shortly after they were incorporated, and years before the Corporation Tax Act was passed, one of them made a lease which its stockholders had agreed to make before its incorporation, and another took the title to 40 acres of land which its stockholders had agreed to purchase before its incorporation, and except that one of them expended $990 in exploring 40 acres of land it owned to be certain there was no ore in it preparatory to a contemplated platting of it into lots for sale, although the land was never in fact platted or sold, and except the following:

The leases provided that the lessees should mine and remove all the merchantable ore wherever they wrought, and that they should conduct their operations in the way and leave the lands in the condition required by the rules and practices of good mining, and each of the three corporations employed a corporation engaged in the business of inspecting mines properly to inspect the operation of the lessees to see that they performed their part of their contracts. One of these corporations employed Mr. Longyear, when the Great Western Mining Company was making explorations of some of its land, to take samples and classify them, in order that it might know what ore the Great Western Company found. A few tracts of the land had been platted into lots before they were conveyed to the corporations, and the corporations took them under a prior contract with Longyear & Co. that the latter might sell the lots, and one of the companies conveyed lots so sold and received the proceeds thereof. The timber on the land in 1892 had been reserved by the Pillsburys, and they removed it; but after the incorporation of the companies a small amount of stumpage was sold, doubtless from trees growing meanwhile. The companies leased a few lots to squatters near towns, in order to evict them from the land more easily; but all these things were incidental to and a part of the duties of these corporations as owners of the claims for the royalties on the ores and of the lands to care for their property as owners, and convert it into money, and to distribute the money to their stockholders. They conducted no other business and did nothing more. As fast as they received the moneys owing under the leases and the small amounts they realized from the sale of lots, land, and stumpage, they deducted their necessary expenses and distributed the remainder among their stockholders. The lessees extracted the ores from the lands from year to year, and exhausted and paid in full for the ores covered by many of the leases before the act of 1909 took effect. There remained, however, at that time several leases which had not been fully exhausted, and it was the royalties collected in 1909, 1910, and 1911 on the ores extracted under these leases which the Commissioner deemed gross income of these corporations, by which he measured the taxes he exacted from them. So it was that when the act of 1909 took effect these corporations were the owners of claims against the lessees for royalties on ores in lands in Minnesota under leases made years before that act took effect, and of the lands themselves, which had no substantial value without the ore, they collected parts of those claims in 1909, 1910, and 1911, and an excise tax of 1 per cent. on the amounts so collected and on small amounts they received from sales of some lots, lands, and stumpage they owned, has been collected, on the ground that these amounts constituted

the gross income of the corporations, and no reduction has been allowed for the conversion of parts of their property or capital into money, or the deprecia-tion of the values of their property by these collections, and the distribution of the amounts they received to their stockholders.

Charles C. Houpt, U. S. Atty., of St. Paul, Minn., for plaintiff in error.

John R. Van Derlip, of Minneapolis, Minn. (Fred B. Snyder and Edward C. Gale, both of Minneapolis, Minn., on the brief), for defendants in error.

Before SANBORN and CARLAND, Circuit Judges, and REED, District Judge.

SANBORN, Circuit Judge (after stating the facts as above).  [1] For doing business in a corporate capacity the Tax Corporation Act of August 5, 1909 (36 Stat. 112, § 38), imposes upon every corporation organized for profit having capital stock represented by shares an annual excise tax equivalent to 1 per cent. of its net income above $5,000. It provides that such net income shall be ascertained by the deduction from "the gross amount of the income of such corporation  *  *  * received within the year from all sources" by it (1) its expenses of operation paid out of income; (2) its losses including a reasonable allowance for the depreciation of its property; (3) certain interest paid by it; (4) taxes paid by it; and (5) dividends on stock of corporations subject to the excise tax.  The basis of the standard or measure by which the amount of the tax is to be determined is "the gross amount of the income of such corporation  *  *  *  received within the year from all sources," not the gross amount received by the corporation from all sources, and from this amount of its income is to be deducted its expenses paid out of its income, not any expenses paid out of its capital or property, and an allowance for depreciation of its property.

[6] That the word "income" in this act is not synonymous with the word "receipts," and that it does not include receipts from the conversion without gain or profit of any part of the corporation into money, or into any other form, is demonstrated by the fact that this word "income" appears in the clause "the gross amount of the income of such corporation," and segregates and designates a specific part, and not all, of the receipts of the corporation as the basis of the measure of the tax, by the fact that only those expenses paid out of income, none of those paid out of capital or property, are to be deducted, by the fact that a deduction for depreciation of property is to be made, by the evident purpose and the whole tenor of the act.  This word "income" is used throughout the statute in contradistinction to "property" or "invested capital," and it was neither the intention of the Congress nor is it the legal effect of the act to impose any tax on account of the amounts received by a corporation that is not engaged in the business of buying, selling, or trading in property, from the conversion of its property without gain into money or into any other form. These corporations were never engaged in any such business.  And it is not doubtful that the small amounts of money received by them from the sales of the lots and lands that were conveyed to them at their

organization in 1906 were not income, but were mere proceeds of parts of their property on account of which they could not be lawfully taxed.

[4] But were the royalties which had been owing to these corporations by the lessees since 1906, and which these corporations collected and received in 1909, 1910, and 1911, as they fell due, income by the amount of which the taxes upon them must be measured under the tax act, or were they the mere proceeds of the conversion without gain or profit of parts of their property into money and no part of the measure of their lawful tax? The lands, and hence the property, of the corporations, had no substantial value without the rights to collect the royalties the lessees had covenanted to pay. The leases had been made by the former owners prior to 1907, and if there was any gain, profit, or income from the making of the leases, that income accrued years before the Tax Act took effect, and the corporations are exempt from any taxation on account of it. The lessors by the leases granted to the lessees the exclusive right to dig, remove, and have all the iron ore in the lands and the right to remove it during terms such as 25 or 50 years, so long in fact that they were in effect a grant of the right to take it without limit of time or quantity. The lessees had covenanted to pay annually certain fixed amounts such as 25 cents or 30 cents a ton for the ore they extracted and to pay fixed minimum amounts every year whether they extracted ore or not which were contracted to be and were credited on their liability for ore subsequently taken whenever in any year they failed to extract sufficient ore to come to the minimum amounts. In 1906 and 1907 these corporations took from the lessors the latter's claims and rights to collect and receive from the lessees the royalties they had covenanted to pay for the ore, and the title to the lands and issued their stock therefor. If there was any gain, profit, or income in this transaction it was made in 1906 and 1907, at least two years before January 1, 1909, when the Tax Act took effect, and the corporations were exempt from taxation on account of that income. Merchants' Ins. Co. v. McCartney, Fed. Cas. No. 9,443, 17 Fed. Cas. 46.

On January 1, 1909, when the act took effect, and for years before that date, these corporations were the owners of the claims and rights to collect and receive the amounts which the lessees had covenanted by the leases to pay for the ore in the lands and of the lands themselves. These things were their absolute property on January 1, 1909, and none of them was any part of their subsequent income, gain, or profit. The land was practically worthless; the rights and claims to collect the amounts the lessees had covenanted to pay for the ores were practically all there was of value in their property, and these were worth hundreds of thousands of dollars. If they had sold these claims in 1909 for cash for their actual value, for no more and no less than their actual value, no part of that cash could have been gain, profit, or income. It could not have escaped being a mere different form of their property, of their capital, and the corporations could not have been taxable on account of it. If prior to 1909 A. had bought promissory notes secured by mortgages worth their face, payable without interest during the years 1909, 1910, and 1911, and had collected them during those years, the moneys thus collected could not have been his gain, profit, or in-

come. It could not have escaped being simply a different form of his property or capital. If in 1906 the owner of land had sold it for the promissory notes of B. secured by mortgages worth their face, payable without interest 10 per cent. annually during ten years, and had contracted to convey the land upon the payment of the notes, and A. had purchased the notes prior to 1909, and had collected the amounts due on them during the years 1909, 1910, and 1911, the moneys so paid could not have been income. They must have been but a part of A.'s property in another form, for the amount and value of his property would be the same the moment after he collected any of them that it was the moment before. The only difference would have been that the moment before it would all have been in notes, and the moment after part of it would have been in notes and part of it in cash. So when the parts of the rights and claims of these corporations which the lessees covenanted by the leases to pay for the ores came due and were received by the corporations in 1909, 1910, and 1911, the value of their property was neither increased nor diminished. The amount and the value of their unpaid claims was diminished by the amount that the value of their cash was increased by the payments, and the moneys received became a part of their property.

In the application of this Tax Act to the numberless and varied situations which different cases present, the actual facts of each case and their real consequences must be considered and given legitimate effect, regardless of misleading names and forms. The fact that the amounts which the lessees covenanted to pay are called rents or royalties in the leases or elsewhere must not be permitted to blind us to the true nature of the transactions which those leases evidenced. They were negotiated, and all but one of them was executed, by the individual owners of the lands prior to 1907. The land, including the right to the ore in it, was worth hundreds of thousands of dollars. Without the right to the ore it was worth practically nothing. By the leases the owners of the land granted to the lessees the absolute and exclusive right to take out and have all the ore in the land, and to remove it at any time within 25 to 50 years, a time so long that it was ample to enable them to remove all of it, and was equivalent to an unlimited time, and the lessees agreed to pay the yearly fixed amounts per ton for all the ore they should take, and to pay the minimum amounts annually whether the ore was taken or not. The result was that the lessors granted a part of the corpus of the property, that by the grant the lessees were made the owners of the ore and the lessors the owners of the claims and of the rights to collect the amounts the lessees covenanted to pay for the ores, and the transactions were in reality sales of the ore for covenants to pay the purchase price thereof. A mining lease, whereby the lessee is granted the absolute and exclusive right to dig for, remove, and have the mineral in the land during terms sufficiently long to enable him to remove it, is in reality a sale of the ore, and the royalties reserved are in fact the purchase price of it. Stoughton's Appeal, 88 Pa. 198, 201, 202; Scranton v. Phillips, 94 Pa. 15, 22; Coltness Iron Co. v. Black, 6 Appeal Cases, 315, 335 (where Lord Blackburn says: "It was said by Lord Cairns in Gowan v. Christie, 3 Ex. D. 23, that a lease of mines 'is not in reality a lease at all in the sense in which we speak of an agri-

cultural lease. There is no fruit; that is to say, there is no sowing and reaping, in the ordinary sense of the term and there are no periodical harvests. What we call a mineral lease is really, when properly considered, a sale out and out of a portion of the land.' I think this is a perfectly accurate statement"); Eley's Appeal, 103 Pa. 300; Delaware, L. & W. R. R. Co. v. Sanderson, 109 Pa. 583, 1 Atl. 394, 396, 58 Am. Rep. 743; Hope's Appeal (Pa.) 3 Atl. 23; Caldwell v. Fulton, 31 Pa. 475, 72 Am. Dec. 760; Harlan v. Lehigh Coal & Navigation Co., 35 Pa. 287, 292; Tiley v. Moyers, 43 Pa. 404, 410; Fairchild v. Fairchild (Pa.) 9 Atl. 255, 257.

It is true that there is a decision in apparent conflict with this rational and established rule. State v. Evans, 99 Minn. 220, 223, 225, 227, 108 N. W. 958, 9 Ann. Cas. 520. But that was a decision ex necessitate, and its effect must be limited to its special facts. The Constitution of Minnesota prohibited any sale of any part of the school or swamp lands of the state otherwise than at public sale. A statute of the state had authorized mining leases of these lands. The state had made leases of many of them, upon the faith of which more than $2,400,000 had been invested, when one of them was assailed on the ground that the statute was unconstitutional and the lease was void. Thereupon the court saved the leases and the statute on the grounds that if there was any doubt of the constitutionality of the law it was their duty to uphold it, that the state officers had acted upon the theory that it was valid, that it had been before the Supreme Court four times and they had rendered decisions based upon it without any challenge of its constitutionality and that it was not so clear that it was unconstitutional that it was their duty to strike it down. That decision is not persuasive in the case at bar.

If the purchase price of the ores, called "royalties" in the leases, ever became income, it must have been when the leases were made. But the truth is that the leases merely changed the form of the property of the lessors from the ores to the rights and claims to the purchase price of the ores, which the lessees covenanted to pay under the name of "royalties," and the receipts by the corporation of the payments of the parts of those claims which fell due in 1909, 1910, and 1911, were but another substitution of the cash received for the parts of the claims paid. If the sums paid were gain, profit, or income, they might have been withdrawn and expended by the corporations without diminishing the value or amount of their property; but the claims are in fact diminished in amount and value by the amounts paid on them, and the property of the corporations is depreciated by the same amounts, unless the moneys so paid are substituted for the parts of the claims paid and remain the property of the corporations. As the claims are paid, their amounts and their values decrease.

All the ore sold by some of the leases has already been extracted, the claims for its purchase price or royalties have been paid in full, and the claims for them have become worthless. The ore under one of the leases was exhausted in 1911, and the claim for its purchase price or royalties then became worthless. If the amounts paid under the name of royalties for the ore taken under the exhausted leases had been income, the claims for the royalties would still have been of their original

value, notwithstanding the payments, and the same is true of claims which have been paid in part only. These considerations compel the conclusion that these payments on the claims were not income, but parts of the capital of the corporations.

There is another view of these cases sustained by the record that leads to the same conclusion. The proof is plenary and uncontroverted that the sole purpose of the owners of the claims for the royalties and purchase price of the ores and of the lands in organizing the corporations and making them the owners thereof was to collect by means of them those claims, convert the property into money, and distribute it among the grantors to the corporations; that this was the sole purpose of the stockholders of the corporations and their directors and officers in receiving the ownership of the property; and that the corporations have confined their operations to so converting into money and distributing the proceeds of this property. The reason for these acts was that the interests of the owners were undivided, that they were so numerous and of such ages and conditions that a partition of the property in kind or by a conversion into money and a distribution of it had become imperative, and the owners determined to effect it. Any one of these owners had the equitable right to such a partition. If one or more of them had petitioned the proper court for such relief, and the court had appointed a receiver or master to collect the claims for the purchase price of the ore or royalties, and to convert the property into money and distribute it among the owners according to their respective interests, could any court lawfully have held that the proceeds thus obtained were the gain, profit or income of the equitable owners? These corporations stood in the same relation to the claimants for the purchase price of the ore, or the royalties and the moneys they collected from them, and to the equitable owners of the property, their stockholders, that such a receiver would have stood. In reality they received and held these claims and the moneys collected from them in trust to distribute them among the equitable owners of the property, and the moneys they have collected were no more the income of the corporations or of their stockholders than is any part of the claims that are not collected or any other part of their property. Those collections were simply another form of the property of the corporations and of the stockholders substituted for the parts of the claims paid.

The considerations which have now been stated have convinced that there was no error in the decision of the court below that the moneys collected by the corporations in 1909, 1910, and 1911 under the mining leases on the claims for the royalties on or the purchase price of the ore were not either gross or net income within the meaning of the Tax Act, and that corporations that were, when the Corporation Tax Act took effect on January 1, 1909, the owners of claims purchased years earlier for royalties on ores under mining leases made by their grantors, whereby the absolute right to dig and have all the ore in the lands leased, which without the ore were worthless, and to remove it at any time during terms so long as to be equivalent to an unlimited time, was granted to lessees, and they covenanted to pay therefor yearly fixed amounts per ton for the ore extracted, and minimum amounts yearly to be credited on ore subsequently removed in case sufficient to come

to the minimum was not extracted in any year, are not taxable on account of the amounts coming due and received by the corporations in partial payment of those claims during the years 1909, 1910, and 1911, where their property was formerly owned and was conveyed to them by their original stockholders, and the sole purpose of the conveyance and of their organization was to enable them to collect these claims, to convert the property conveyed to them into money, and to divide the proceeds among their stockholders, and the corporations have not engaged in mining, trading, or any other business, but have strictly confined their operations to the accomplishment of that purpose. Stevens v. Hudson's Bay Co., 101 Law Times Reports, 96, 97, 98, 99; Foley v. Fletcher, 3 H. & N. 769, 774, 778, 783, 787; Secretary of State for India v. Scoble, 89 Law Times Rep. 1, 3; Tiley v. Moyers, 43 Pa. 404, 410; Gibson v. Cooke, 1 Metc. (Mass.) 75.

Before assenting to these conclusions, the arguments of counsel for the United States and the following authorities cited by him were read and considered:

Stratton's Independence, Limited, v. Howbert, 231 U. S. 399, 34 Sup. Ct. 136, 58 L. Ed. 285: But the decision in that case rests on the conceded proposition that a corporation that is engaged in mining its own property is presumed to be using its property or capital and the labor it employs in the business of mining for profit or income, and that the proceeds of that business, less its expenses, must be presumed, in the absence of evidence to the contrary, to contain gain or income derived by the company from the business of mining from which a reasonable allowance for depreciation of the property may be deducted to find the net income which exactly measures its tax. The extent of that decision was (1) that corporations actively engaged in the business of mining their own property are subject to the corporation tax; (2) that the proceeds of ores mined by a corporation from its own premises include presumptive gain or income from its mining business, and are therefore included in its gross income, within the meaning of the tax Act; and (3) that the allowance to be made for the depreciation of its property by reason of the extraction of the ore so mined is not the exact difference between the proceeds of the mining, less the expenses thereof, because such an allowance excludes the possibility of gain from the mining business the existence of which is presumed. 231 U. S. pages 418, 421, 34 Sup. Ct. 136, 58 L. Ed. 285. The decision applies to the corporations that are the lessees and are conducting the business of mining the ores sold through these leases in the cases in hand, but it is inapplicable to the plaintiffs below, because they do not and cannot get the gain or income from the mining which the lessees receive, and they have not been and are not conducting the business of mining, or doing any other business for gain, but have been, were, and are confining their operations to the collection of their claims, and the conversion of their property into money, and dividing its proceeds among the equitable owners thereof, their stockholders.

Flint v. Stone Tracy Co., 220 U. S. 107, 145, 146, 170, 31 Sup. Ct. 342, 55 L. Ed. 389, Ann. Cas. 1912B, 1312: In these cases the Supreme Court held that the rents received by a corporation engaged for profit in the business of owning and leasing taxicabs, or build-

ings, or ore lands, constituted a part of its gross income within the meaning of the tax act. But the plaintiffs below never have been engaged in any such business. They never negotiated a mining lease. If there ever was any gain from owning and leasing any of their property, it was made by their grantors more than two years before January 1, 1909, and had become à part of the property, the capital they were organized to and have confined themselves to converting into money and dividing among the equitable owners thereof, the cestuis que trust, and the facts of this case exclude them from the operation of the principles on which the Flint Cases rest and from the effect of that decision.

Authorities to the effect that a devise of rents and profits of mineral lands with power to an executor to make leases thereof was intended by the testator to and did carry the royalties under such leases to the devisees. Daly v. Beckett, 24 Beavan's Rep. 114; Eley's Appeal, 103 Pa. 300, 305, 307; McClintock v. Dana, 106 Pa. 386; Appeal of Shoemaker et al., 106 Pa. 392; Reynolds v. Hanna (C. C.) 55 Fed. 783, 800, 801. But these decisions are irrelevant to the construction of the Corporation Tax Act or its application to the facts of this case, because the intent of the testator drawn from the terms of his will and his situation necessarily determined the decision in each case, and the terms and purpose of each will was too far aside from the terms and object of the Tax Act, and because the testators of these wills contemplated and authorized the business of mining by the executor by means of which he could make long or short leases. But the plaintiffs below neither mined nor made leases, but confined their operations to the mere collection of claims for royalties or the purchase price of the ores and the conversion of their property into money and its distribution, without gain to themselves, among those for whom they held it in trust before the Corporation Tax Act took effect.

Authorities to the effect that a lessee corporation engaged in the business of mining is not forbidden, by the general law that corporations conducting business for profit may not pay dividends out of capital, from paying dividends out of the net proceeds of their mining business. Lee v. Neuchatel Asphalte Co., 41 Chan. Div. 1, 27; Excelsior Water & Min. Co. v. Pierce, 90 Cal. 131, 140, 27 Pac. 44. But these decisions are inapplicable to the cases in hand for the same reasons as is the Case of Stratton's Independence.

Authorities to the effect that the proceeds of the operation of mining and selling ore from lands owned or leased by the operating company, less the expenses of operation, are subject to taxes imposed by statute on "net earnings or income," or on "profits." Commonwealth v. Ocean Oil Co., 59 Pa. 61, 63, 64; Commonwealth v. Penn Gas Coal Co., 62 Pa. 241, 242; Coltness Iron Co. v. Black, 6 Appeal Cases, 315, 335, 336; People v. Roberts, 156 N. Y. 585, 51 N. E. 293. But these decisions, like that of Stratton's Independence, apply only to companies actively engaged in the business of mining. The plaintiffs were not so engaged. They confined their operations strictly to the collection of claims against lessees for the purchase price of or royalties on the ore, and the conversion of their property

acquired years before the Tax Act took effect into money and its distribution among their stockholders, the equitable owners of it. They do not fall under the decisions in the cases cited by counsel for the United States, nor under the rules or reasons on which they rest. They are far within the established principle that the collection of a good claim, or the conversion of property by sale or otherwise into its true value in money, does not transform the proceeds into income, but merely substitutes them for the claim so collected, or the property sold, and leaves them in a different form, a part of the capital or property from which they were derived. A reading of the opinions of the courts, study and meditation on the terms and meaning of the Tax Act, on the facts of these cases, and the reasons for the propositions of counsel, have convinced that such was the nature of the moneys received by the plaintiffs during the years 1909, 1910, and 1911 from their collections of their claims against the lessees for the purchase price of or the royalties on the ore, that those amounts were not a part of either the gross income or of the net income of the corporations, and that the judgments of the court below were right.

It is interesting to note here, though, for the reasons stated, it is not material to the decision of this case, the ground upon which Lord Blackburn, who delivered the main opinion in the leading case of Coltness Iron Co. v. Black, 6 Appeal Cases 315, 330, 336, placed the decision in that case that the proceeds of an operating mining company were taxable as income under the English Income Tax Act. He did not place it on the ground that such proceeds were gains or profits, but on the ground that the statute, which imposed a yearly tax "for every 20s. of the annual value thereof, the sum of 7d.," and provided that "the annual value of all the properties hereinafter described shall be understood to be the full amount for one year, or the average amount for one year (and of the property of mines for five years), of the profits received therefrom within the respective times herein limited," must be construed in the light of previous English tax legislation and practice to mean that the proceeds of the mines were the measure of this taxation. Pages 334, 335. In order to reach this conclusion he reviewed the history of English taxation from the times of Elizabeth, and showed that, long before any income tax was imposed, coal mines were rated for taxation on the basis of their production (pages 330, 331), that this practice had been followed under the earlier statutes, whether they imposed property or income taxes, and from this long practice and this earlier legislation he drew the conclusion that such must have been the intention of the legislators who enacted the income tax statute, and overruled an earlier decision to the contrary (pages 335, 336; Knowles v. McAdam, 3 Ex. D. 23). Repeated readings of this opinion and the other opinions in that case lead to the conclusion that they are not even persuasive of the true interpretation and application of our Corporation Tax Act, because they are dominated by a long practice in taxation and a course of legislation that have never existed in this country.

[2] There are still other reasons than those which have been stated why the judgments below should not be reversed. If there were er-

ror in the conclusion that the receipts of the companies from their collections of the amounts of their claims against the lessees which came due in 1909, 1910, and 1911 for the purchase price of or the royalties on the ore were not included in their gross income, if they were a part of that gross income, then the companies would have been entitled to "a reasonable allowance for depreciation of property" by the reduction of the values of their claims by these payments. Stratton's Independence, Limited, v. Howbert, 231 U. S. 399, 418, 34 Sup. Ct. 136, 58 L. Ed. 285. And as the payments on these claims unavoidably reduced and depreciated their value, as has been shown, by the amounts paid, there would have been no net income from them on account of which an excise tax could have been lawfully exacted. United States v. Nipissing Mines Co. (D. C.) 202 Fed. 803, 805; Stevens v. Hudson's Bay Co., 101 L. T. Rep. 96, 97, 98.

[3] Again, this excise tax was imposed on corporations for doing business in a corporate capacity. It is imposed on corporations "doing business," and on those only. Corporations that are the owners of property not used in business, that themselves engage in no trading, mining, or other like business for gain, but confine their activities to acts necessary or incidental to the protection of their property and its conversion into money, are not "doing business" within the meaning of the Corporation Tax Act. These companies were such owners during the years 1909, 1910, and 1911, and, as has been shown, they not only so confined their operations, but in 1909, by an amendment of their articles of incorporation, they disabled themselves from conducting any other operations or doing any business within the true interpretation of the Tax Act. They were not, therefore, taxable under that act, and for that reason the judgments below are right. McCoach v. Minehill Ry. Co., 228 U. S. 295, 305, 306, 309, 311, 33 Sup. Ct. 419, 57 L. Ed. 842; Zonne v. Minneapolis Syndicate, 220 U. S. 187, 190, 31 Sup. Ct. 361, 55 L. Ed. 428; United States v. Nipissing Mines Co., 206 Fed. 431, 433, 434, 124 C. C. A. 313.

[5] It is true that the court below took the opposite view of the last proposition, and the companies sued out no writs of error. But there was no error in the course of the trial of the cases, nor in the judgment, and a right judgment, which is warranted by the record and the facts, may not be reversed on the sole ground that the trial court gave a wrong reason for it. Smiley v. Barker, 83 Fed. 684, 687, 28 C. C. A. 9, 12; Baker v. Kaiser, 126 Fed. 317, 318, 61 C. C. A. 303, 304; Buster v. Wright, 135 Fed. 947, 959, 68 C. C. A. 505, 517.

Let the judgments below be affirmed.