## UNITED STATES v. GUGGENHEIM EXPLORATION CO.

### (District Court, S. D. New York. January 4, 1917.)

### No. 22.

1. INTERNAL REVENUE ☜9—EXCISE TAX—STATUTE—CONSTRUCTION.
    Excise Tax Law Aug. 5, 1909, c. 6, 36 Stat. 11, must be construed in favor of taxation.
    [Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 13–28; Dec. Dig. ☜9.]

2. INTERNAL REVENUE ☜9—CORPORATE EXCISE TAX—"INCOME"—"OUTGO."
    Within Excise Law Aug. 5, 1909, § 38 (Comp. St. 1913, §§ 6300–6307), imposing a tax on the net income of corporations, the tax being measured

by the net income received from all sources, "Income" means the flow of capital service, and is not synonymous with receipts; a disservice is a negative service, and a flow of disservice or negative income is called "outgo."

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 13–28; Dec. Dig. ☞9.

For other definitions, see Words and Phrases, First and Second Series, Income.]

3. INTERNAL REVENUE ☞28—CORPORATE EXCISE TAX—ACTION TO COLLECT—BURDEN OF PROOF.

In an action to collect a corporate excise tax on the amount received by a corporation for the sale of stock owned by it, which had been carried on its books at the value of one dollar, the burden is on the government to show that the stock was worth only one dollar.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 76–81; Dec. Dig. ☞28.]

4. INTERNAL REVENUE ☞9—EXCISE TAX—INCOME—SALE OF PROPERTY.

Where defendant corporation had five years before transferred to another corporation mining property which the directors of the latter appraised at $49,000,000 in return for $17,000,000 of the preferred stock and $24,000,000 of the common stock in the other corporation, and the common stock the year before had received dividends of 7 per cent. and was reported by the president to be worth par, the amount received from the sale of such stock at less than par by defendant was not taxable as part of its income for the year, though the stock had been carried on the books of the corporation at a valuation of one dollar, since the actual value, and not the book value, must be considered in determining the income.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 13–28; Dec. Dig. ☞9.]

Action by the United States against the Guggenheim Exploration Company to recover the excise tax. Final judgment for defendant.

H. Snowden Marshal, U. S. Dist. Atty., of New York City (Ben A. Matthews, Asst. U. S. Atty., of New York City, of counsel), for the United States.

Louis Marshall, of New York City, for defendant.

MANTON, District Judge. The defendant, a New Jersey corporation, for the purpose of acquiring, developing, and operating mines in various parts of the world and acquiring the shares of stock and other securities of corporations engaged in a similar business, owned, in 1905, a large number of mining properties and interests in such properties.

The American Smelting & Refining Company, a New Jersey corporation, was likewise interested in mining properties. Both corporations were owned by practically the same stockholders. By arrangement between the two corporations, the American Smelters' Exploration Company was organized and acquired some of the properties of the defendant and of the American Smelting Company. The object of this last corporation was for the purpose of conducting a business similar to that carried on by the defendant. As originally organized, it was to have a total authorized capital stock of $54,500,-

000, of which $22,500,000 was to be known as "Preferred Stock Series A," $7,500,000 as "Preferred Stock Series B," and $24,500,-000 was to be common stock. On March 30, 1905, the defendant offered to sell to the American Smelters' Exploration Company various properties and property interests which were specified in the offer and contained in a resolution found in the minute books of the company, and also agreed to acquire and turn over to the American Smelters' Exploration Company 40 per cent. of the capital stock of the Velardena Mining & Smelting Company, which was not then the property of the defendant, the latter paying therefor $1,600,000 of the preferred stock series A, and $1,000,000 of the common stock of the American Smelters' Exploration Company which was to be received by it, and that it would turn over as much of the outstanding stock of the Velardena Mining & Smelting Company as should be practicable. It was further provided that, if it should be unable to acquire any part thereof, it would pay into the treasury of the American Smelters' Exploration Company, in lieu thereof, such portion of the $1,600,000 of preferred stock series A, and of the $1,000,000 common stock of the American Smelters' Exploration Company, as such unacquired part should bear to the whole of the 40 per cent. of such outstanding stock. The defendant also agreed to turn over to the American Smelters' Exploration Company ores, ore supplies, and other property to the extent of $800,000 and cash to the amount of $4,810,000.

The offer was made upon the condition that, immediately upon its acceptance and the conveyance, transfer, and assignment of the property and payment or provision for the payment of the money which was to be acquired by the American Smelters' Exploration Company, the latter was to issue and deliver to the defendant, its nominees or assigns, $17,000,000 of the preferred stock series A, and $24,497,000 of the common stock of the American Smelters' Exploration Company, and $3,000 in cash. The $5,500,000 of preferred stock series A, other than that which the Guggenheim Exploration Company was to receive, was to be issued only at par for cash or its equivalent, for the future uses and purposes of the American Smelters' Exploration Company. It was further provided that the American Smelting & Refining Company was to guarantee the preferred stock series A.

The American Smelters' Exploration Company, by a resolution passed by its directors, accepted this proposition providing for the issuance of the shares of stock above referred to in consideration of the conveyance and transfer and payment to be made by the defendant and upon the conditions above specified. The resolution recited that, after a very careful examination of the properties and property rights to be transferred, "it is believed that the purchase by this company of the aforesaid mines, real and personal property, and stock, is necessary for the business of this company, and the said property and property interests so deemed to be necessary are in the judgment of this board of directors of the just, fair, and reasonable value of $49,000,000."

The consideration which the American Smelters' Exploration Company was to receive was stated to be $49,000,000. In accordance with these terms of the offer and resolution referred to, the transaction was carried out in 1905; the American Smelters' Exploration Company receiving the properties to be conveyed to it, and the defendant receiving the shares of stock to which it was entitled under the terms of the contract entered into. In accordance with the terms of its offer, the defendant transferred to the owners of the 40 per cent. of the capital stock of the Velardena Mining & Smelting Company $1,600,000 of the preferred stock series A, and $1,000,000 of the common stock. This left in the hands of the defendant $15,400,000 of the preferred stock series A. The $7,500,000 of the preferred stock series B were sold by the defendant, and subsequently it repurchased from the American Smelting & Refining Company, in 1905, $2,000,-000 of the preferred stock series A.

In connection with these transactions which the defendant had with the American Smelting & Refining Company, it transferred to the latter $12,251,000 of the common stock of the American Smelters' Exploration Company, retaining 112,490 shares of the common stock of the American Smelters' Exploration Company. This company subsequently changed its name to the American Smelters' Securities Company, which increased the amount of its preferred stock series B to $30,000,000 and its common stock to $30,000,000. The defendant, however, continued to hold the 112,490 shares of common stock of the American Smelters' Securities Company until January 25, 1911, when it was sold for $6,749,400 to the American Smelting & Refining Company. The common stock of the American Smelters' Securities Company was not sold on the market prior to this sale by the defendant. This common stock owned by the defendant was carried on its books at the valuation of $1.

The government now claim that the amount realized on the sale of these 112,490 shares of common stock of the American Smelters' Securities Company represents a profit upon which an excise tax of $67,471.49 should be collected. For the reason that this item of profit was not returned by the defendant in calculating its tax for the year 1911, recovery is sought under the Excise Law of August 5, 1909. Section 38 of that act provides:

"That every corporation * * * organized for profit and having a capital stock represented by shares * * * now or hereafter organized under the laws of the United States or of any state or territory of the United States * * * shall be subject to pay annually a special excise tax with respect to the carrying on or doing business by such corporation * * * equivalent to one per centum upon the entire net income over and above five thousand dollars received by it from all sources during such year. * * *" Comp. St. 1913, § 6300.

Another provision of the act provides:

"Such net income shall be ascertained by deducting from the gross amount of the income of such corporations * * * received within the year from all sources," various items, etc. Comp. St. 1913, § 6301.

[1, 2] The trend of judicial opinion has been to examine closely the phraseology of the act itself, and it must be construed in favor of taxa-

tion. Many authorities cited by counsel have been influenced by the phraseology of the particular law upon which the action in each case is founded. From these quotations of the act in question here, it is evident that the tax is to be measured by the net income from all sources received within the year. The fundamental question, an all-important one, is: Was this sale a profit income from any sources received within the year?

[3] What is "income"? The flow of capital's service is its income. A disservice is a negative service. A flow of disservice or negative income is called "outgo." The income of our capital is that which it does for us. Therefore, another essential inquiry and, indeed, the basic one here, is the determination of a question of fact, as to what was the value of the common stock at the time it was acquired by this defendant. The burden of establishing its case is upon the government. Its obligation is to show by a fair preponderance of evidence that the common stock was worth but $1. In endeavoring to sustain this burden, the plaintiff relies solely upon the alleged admission against interest on the books of the defendant of a valuation of $1 for this stock.

[4] The sacrifice which the defendant made to become a stockholder of the American Smelters' Securities Company was its payment and transfer to said company of certain properties. The benefits received are represented by the amount realized on the sale of the common stock plus the amount of the preferred stock remaining on hand. The benefits less the sacrifices would constitute the income. Therefore the ascertainment of the values of the properties conveyed by the defendant is all-important, for, at the time when the excise law went into effect, these shares of stock, whatever they were worth, constituted the capital of the corporation. The amount that was realized on them could not have been income for the year 1911 for the reason that it represented the amount realized on the conversion of capital from one form into another.

The preceding facts, as narrated here, taken largely from the minutes and books of the corporations, indicate that the common stock was worth more than $1, and that the statement of value as $1 on the books of the defendant was a mere convenience of bookkeeping. The records of the defendant and of the American Smelters' Securities Company show that the property transferred in consideration of the stock issued to the defendant was valued at $49,000,000, which represented the face value of the shares of stock issued to the defendant. The resolutions adopted by the American Smelters' Securities Company, which purchased the shares of stock, show that as a result of an expert examination of the property and property interests offered to be sold, and the advantages to be derived by the American Smelters' Securities Company by the acquisition of the property transferred, the property was worth $49,000,000. The board of directors declared in this belief by adopting the resolutions and said that "in the judgment of this board of directors it was fairly and reasonably worth $49,000,000."

The New Jersey Corporation Law (section 49) provides:

"Any corporation formed under this act may purchase mines, manufactories or other property necessary for its business, or the stock of any company or companies owning, mining, manufacturing or producing materials, or other

property necessary for its business, and issue stock to the * * * value thereof in payment therefor, and the stock so issued shall be full-paid stock and not liable to any further call, neither shall the holder thereof be liable for any further payment under any of the provisions of this act; and in the absence of actual fraud in the transaction, the judgment of the directors as to the value of the property purchased shall be conclusive." 2 Comp. St. N. J. 1910, p. 1630.

No attack is made on the good faith of the directors who so solemnly declared in the resolution referred to the value of the property in question. These facts overcome in weight the alleged admission against interest of the defendant in its books when it places the valuation of the common stock in question at $1.

In Mitchell Bros. v. Doyle (D. C.) 225 Fed. 437, the court said:

"The fact that plaintiff carried its properties upon its books at their original cost prices is neither material nor important. Mere bookkeeping entries cannot preclude the government from collecting its revenues, nor are such entries conclusive upon the taxpayer, when it is shown, as here, that they represent and indicate ancient, instead of present, actual values. The bookkeeper creates nothing; his methods, figures, and records must yield to proven and established facts."

In U. S. v. Nipissing Mines Co. (D. C.) 202 Fed. 803, Judge Lacombe said:

"The suggestion that there can be no allowance for depreciation unless such depreciation is entered in the books of the company, recorded from time to time, seems to me without force. The books may be very badly kept, kept in such a way as will in the end bring them into trouble and difficulty; but this act does not provide any penalty for bad bookkeeping."

The net income of a corporation subject to the excise tax is not to be determined by bookkeeping facts, but by real facts. An increase in the book value of the assets of a corporation by a revaluation of property does not constitute any part of the gross amount of its income received within the year, and that, on the other hand, a book charge, because of the sale of an issue of bonds at less than par, is not a part of the expenses actually paid within the year out of the income to be deducted from gross income. Baldwin Locomotive Works v. McCoach (D. C.) 215 Fed. 967.

Some further evidence of valuation is found in the annual reports of the board of directors of the defendant to its stockholders for the years ending December 31, 1908, and December 31, 1909. In the first year, it is stated that, although these shares of stock were carried on the books at $1, there was every reason to believe that they were worth at least $40 a share, which meant $4,500,000.

In the 1909 report, a statement is contained that the company was earning 7 per cent. on its common stock and it was worth par. This report was rendered within a few months after the Corporation Excise Law went into effect. After Mr. Hills of the American Smelters' Securities Company testified that the company not only earned the dividends on its preferred stock, both series, but about 11 per cent. on its common stock. This was a showing for the year 1909.

In a recent case in the Eighth Circuit (Lynch v. Turrish, 236 Fed. 653, —— C. C. A. ——) decided September 4, 1916, Judge Sanborn said:

"The words 'income, gains, and profits' are used in common parlance and as legal terms in contradistinction to capital, property, and capital assets. The enhanced value of the land or property of a corporation, or of the stock of a corporation, which slowly accrues through a series of years from the natural and gradual increase of the value of the timber land or other property which the corporation holds without trading, is more analogous to property, capital, or capital assets than to income, gains, or profits. It is rather a growth, an increase of the property or capital assets, than income, gains, or profits produced by the property. * * * It is so unequitable, so unjust, so discriminatory to treat such an enhanced value, accruing through many years before the enactment of an income tax law, as the income, gains, or profits of the year in which it happens subsequently to be distributed, that the following rule, which is supported by the more forcible reasons and by the great preponderance of authority, has become the established law in the federal courts. The enhanced value of property which accrues from the gradual increase in its value during a series of years prior to the effective date of an income tax law, although divided or distributed by dividend or otherwise subsequent to that date, does not become income, gains, or profits taxable under such an act. Such enhanced value, like the property of which it is an outgrowth and in which it adheres, becomes the absolute property of its legal and equitable owners before the effective date of the law, and as against such a law thereafter remains their capital assets. Gray v. Darlington, 15 Wall. 63 [21 L. Ed. 45]; Sargent Land Co. v. Von Baumbach [D. C.] 207 Fed. 423; Von Baumbach v. Sargent Land Co., 219 Fed. 31 [134 C. C. A. 649]; Gauley Mt. Coal Co. v. Hays, 230 Fed. 110 [144 C. C. A. 408]; Industrial Trust Co. v. Walsh [D. C.] 222 Fed. 437."

The word "income" is not synonymous with the word "receipts." Von Baumbach v. Sargent Land Co., 219 Fed. 31, 134 C. C. A. 649. Income, as used in the statute, must be considered in contradistinction to property and invested capital. It is manifestly the purpose of the statute to tax the net income for the year in which the assessment is made.

Applying these rules to the necessary conclusion of fact found in this case, it follows that there is no income, gain, or profit accruing to the defendant during the taxable year in question, and the government has failed to support the burden assumed in prosecuting this claim.

For the reasons assigned, there must be a judgment directed in favor of the defendant.

&⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes