SARGENT LAND CO. v. VON BAUMBACH, Collector Internal Revenue.

KEARSAGE LAND CO. v. SAME. SUTTON LAND CO. v. SAME.

(District Court, D. Minnesota. July 31, 1913.)

1. INTERNAL REVENUE (§ 9*)—CORPORATION TAX—"DOING BUSINESS."

Corporations owning land, part of which they leased for mining purposes distributing the rent and royalties among their stockholders, which had and exercised the right under the leases to inspect the work in the mines as it proceeded, made sales of real estate, sold stumpage from some of the property, leased properties and took leases from squatters in order to more easily evict them, and explored the property for ore, were "doing business" so as to subject them to the federal corporation tax,

whether the acts of inspecting and selling the property were performed through their officers or through other corporations employed by them.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 13–28; Dec. Dig. § 9.*

For other definitions, see Words and Phrases, vol. 3, pp. 2155–2160; vol. 8, pp. 7640, 7641.]

2. INTERNAL REVENUE (§ 9*)—CORPORATION TAX—"ORGANIZED FOR PROFIT."

. Corporations organized to acquire title to an estate for the purpose of liquidating it and dividing the. proceeds among the owners were "organized for profit" within the corporation tax law, especially where they were first organized under the statutory provisions relative to corporations organized for profit, although they later amended their articles of incorporation to describe their purpose as being to unite in one ownership the undivided fractional interests of the various stockholders in lands, tenements, and hereditaments, to own such property, and for the convenience of their stockholders to receive and distribute among them the proceeds of any disposition of such property, since any corporation organized by private persons for their own advantage and interest and not for social, charitable, or beneficent purposes is organized for profit.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 13–28; Dec. Dig. § 9.*]

·3. CORPORATIONS (§ 439*)—POWERS—SALE OF PROPERTY.            \
A corporation, whose articles of incorporation provided that its general purpose was to unite in one ownership the undivided fractional interests of the various stockholders in lands, tenements, and hereditaments, to own such property, and for the convenience of its stockholders to receive and distribute among them the proceeds of any disposition of such property, had implied power to sell property as otherwise there would be no proceeds to distribute.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1774; Dec. Dig. § 439.*]

4. INTERNAL REVENUE (§ 7*)—CORPORATION TAX—"INCOME."

Where numerous owners of land organized a corporation to hold the title thereto, which leased a part thereof for mining purposes, the royalties received under the lease and proceeds of sales were not "income" within the federal corporation tax law, imposing a tax on gross income, although in distributing the royalties to its stockholders it called them dividends, and although no depreciation account was carried on its books, since the ore in place was capital and a part of the real estate, and "income" other than that derived from personal exertion is something produced by capital without impairing the capital and which leaves the property intact, and anything which takes away from the property itself is not income but amounts to a sale of capital assets.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 8–10; Dec. Dig. § 7.*

For other definitions, see Words and Phrases, vol. 4, pp. 3501–3507; vol. 8, p. 7685.]

5. INTERNAL REVENUE (§ 7*) — CORPORATION TAX—INCOME — WHAT CONSTITUTES.
Where numerous owners of mining land formed a corporation to hold the title thereto and manage the property, taking as the capital stock a mere nominal capitalization without reference to value, the difference between this capitalization and the actual value of the land did not represent profits of the corporation, and hence royalties received under leases of such property were not income taxable under the corporation tax law on the theory that they were a part of such profits, especially where the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

royalties were received under leases, all of which were made prior to January 1, 1909.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 8-10; Dec. Dig. § 7.*]

Three actions by the Sargent Land Company, Kearsage Land Company, and Sutton Land Company, respectively, against Fred Von Baumbach, Collector of Internal Revenue. Judgment for plaintiff in each action.

In the early '70's George A. Pillsbury, John S. Pillsbury, and Charles A. Pillsbury, under the firm name of John S. Pillsbury & Co., each owning a one-third interest in the partnership, were engaged in the lumber business, and for that purpose bought several thousand acres of land in the northern part of the state of Minnesota. Some years later the Missabe Iron Range was discovered, and it was found that it ran through much of the lands then owned by the Pillsbury Company. Later Bennett and Longyear made explorations under an agreement by which they were to receive a deed to one-half of such lands as they might select out of the Pillsbury Company's holdings, provided they found iron; and in accordance therewith in 1892 they made a demand for and received a deed to one-half of the iron-bearing lands which were subsequently conveyed to the three plaintiff corporations, in which conveyances Bennett and Longyear joined. In the meantime between the years 1898 and 1901 the three original partners had died, leaving issue, by reason of which the titles to these lands became so much split up and divided that by 1901 the share of some of the heirs amounted to but $1/108$ of the whole property. In order to have the ore mined it was necessary to make leases, and leases of some of these lands were accordingly made in 1901 and 1902. They required the signature of all the owners, some of whom were minors who had to act through guardians. These leases were usually made for 50 years, but the laws of Minnesota forbid a guardian from making a lease for more than 25 years. Later on some of the minor heirs became of age, got married and had children of their own, which still further divided and complicated the titles.

In view of the difficulties in passing titles, and for other reasons, it was decided to incorporate certain of these lands consisting of more than 10,000 acres, and, as the laws of Minnesota do not allow a corporation to hold more than 5,000 acres of land, it was necessary to organize three corporations, so as to cover the 10,000 acres. In 1906 this was done by the organization of the plaintiff companies, and thereupon each member received a certificate of stock representing his exact interest in the lands taken over by the corporations. Each corporation was capitalized at $108,000, made up of 2,160 shares of $50 each. As soon as money was received from the lessees, it was immediately divided and distributed to the stockholders, according to their shares. It was shown that these corporations later employed another corporation to inspect the mines, as they were being operated, to see that the ore was properly extracted and that the lessors received the amounts due under the leases. They also employed another company to sell certain town lots which were part of their property, and they sold the stumpage upon some of their burned over lands.

The defendant, as collector, made a demand that these corporations pay the federal corporation tax for the years 1909, 1910, and 1911. Payment was resisted on the ground that these corporations were organized, not for profit, but merely to receive, divide, and distribute the moneys received from the lessees of the mines; that such moneys, together with what was obtained from the sales of lots and some stumpage, were all the moneys which the corporations received or handled; and further that such amounts so received were not gross income under the meaning of the act. The tax for these years, amounting with penalties to about $27,000, was finally paid, and plaintiffs bring these actions to recover the sums thus collected.

Van Derlip & Lum and Snyder & Gale, all of Minneapolis, Minn., for plaintiffs.

C. C. Houpt, U. S. Dist. Atty., of St. Paul, Minn., for defendant.

WILLARD, District Judge (orally, at the close of the evidence). In the case of Flint v. Stone Tracy Company, 220 U. S. 107, 31 Sup. Ct. 342, 55 L. Ed. 389, Ann. Cas. 1912B, 1312, the court held that this is a tax upon the privilege of doing business in a corporate capacity. There are in that statement two elements: One "doing business," and the other "in a corporate capacity." That these three companies the plaintiffs here are acting in a corporate capacity is unquestioned. It was said in this same case' (220 U. S. on page 162, 31 Sup. Ct. 342, 55 L. Ed. 389, Ann. Cas. 1912B, 1312) that Congress was justified in imposing an excise tax upon corporations on account of certain advantages which accrued from carrying on business in that capacity. The court said on page 161 of 220 U. S, on page 353 of 31 Sup. Ct. (55 L. Ed. 389, Ann. Cas. 1912B, 1312):

"The thing taxed is not the mere dealing in merchandise, in which the actual transactions may be the same, whether conducted by individuals or corporations, but the tax is laid upon the privileges which exist in conducting business with the advantages which inhere in the corporate capacity of those taxed and which are not enjoyed by private firms or individuals. These advantages are obvious and have led to the formation of such companies in nearly all branches of trade. The continuity of the business, without interruption by death or dissolution, the transfer of property interests by the disposition of shares of stock, the advantages of business controlled and managed by corporate directors, the general absence of individual liability, these and other things inhere in the advantages of business thus conducted, which do not exist when the same business is conducted by private individuals or partnerships."

All of these advantages these corporations enjoy, and the evidence in the case shows that they enjoy them to a higher degree than happens in most corporations. The large number of owners of the property, the fact that some of them were minors, and the fact that the property owned was property which could be leased most advantageously for more than 25 years, in which leases a guardian could not join, show almost a necessity that the owners of these properties should transact business in a corporate capacity. They indicate that these companies would, all other circumstances being equal, be under more obligation to pay this tax than others who did not secure so many advantages from the transaction of business in a corporate capacity. But this is immaterial, and I lay aside, for the purposes of this case, all evidence relating to the complex character of the title and the number of owners and look at the case in exactly the same way that I would look at it if Mr. Bennett, Mr. Longyear, and Mr. Snyder, being the sole owners, had organized the companies.

[1] The principal question on this branch of the case is whether these corporations are engaged in business. The definition of that phrase in Flint v. Stone Tracy Company has already been read by Mr. Van Derlip. The court said at page 171 of 220 U. S., on page 357 of 31 Sup. Ct. (55 L. Ed. 389, Ann. Cas. 1912B, 1312):

"It remains to consider whether these corporations are engaged in business. 'Business' is a very comprehensive term and embraces everything about which a person can be employed. Black's Law Dict. 158, citing People v. Commissioners of Taxes, 23 N. Y. 242, 244. 'That which occupies the time, attention, and labor of men for the purpose of a livelihood or profit.' Bouvier's Law Dictionary, vol. 1, p. 273."

It is said that this case is identical with the case of Zonne v. Minneapolis Syndicate, 220 U. S. 187, 31 Sup. Ct. 361, 55 L. Ed. 428, but I see quite a marked distinction between the two cases. It is true that in this case valuable property has been leased for a number of years, and that the companies, so far as that property is concerned, received royalties. In this respect they are similar to the Zonne Case. But in the Zonne Case, so far as the report of that case shows, the owner of the land had nothing to do with the management of the business. It had no supervision over the renting of the building and had no interest in supervising it. Here the evidence shows directly the contrary. It shows that under the terms of the lease the owners of this property have the right to inspect the work in the mines as it proceeds. It not only shows that the companies have that right, but it shows that they in fact exercised it and are exercising it. It shows that they are doing that for their own advantage for the purpose of seeing that all the ore which is valuable and which the lessees are bound to take out is taken out. This appears through all the testimony. It appears in the testimony of Mr. Bennett, and it appears in the resolutions adopted to settle the differences between the Oliver Mining Company and the Kearsage Land Company, with reference to the Glen mine, showing, in fact, that the lessors, so far from remaining idle and passive and doing nothing but receiving the rent which was paid to them, exercised constant watch and care over the operations of the lessees. They did that, and they must have done it necessarily, I assume, because the testimony is that they considered it for their advantage and profit to do so. If that were all that the evidence showed, I should say that this case was radically distinguished from the Zonne Case, also radically distinguished from the Nipissing Case (D. C.) 202 Fed. 803, and from the Minehill Case, 228 U. S. 295, 33 Sup. Ct. 419, 57 L. Ed. 842, because in no one of those cases did the lessor have anything whatever to do with the operation of the physical property. In all three of those cases the lessors simply received the money. They exercised no supervision over the management of the property and had no right to do so, so far as the cases show.

But that is not all. The evidence shows that these three companies during each one of the three years were engaged in selling real estate, and, so far as these sales are concerned, they were not small. The Sargent Land Company's sales amounted to $4,624 in 1909, to $6,629 in 1910, and in 1911 they amounted to $3,385. That was engaging in business, to my mind; it was selling real estate. They also did other things which have been referred to as being of such a light and trivial character as not to justify the court in holding that they constituted a doing of business, such as the sale of stumpage from some of the property which had been burned over, leasing some properties at Hibbing, and taking leases from squatters in order to more easily

evict them. It is true that those matters were trivial, but they indicate that the companies were constantly supervising and caring for this property. It was their business, and in fact it was necessarily their business, because there was no one else to do it. They had to take care of that part of their property which was not leased; some one had to take care of it, and they did take care of it. There was evidence that the Kearsage Company in conducting the explorations in 1909 incurred an expense of $990 in test-pits. I assume that that was for the purpose of exploring the property to ascertain what its value was. It was an exploration of the so-called Pearce 40 to ascertain whether or not there was any more ore there. Under the head of inspection, the Sargent Company in 1909 employed Longyear during explorations made by the Great Western Mining Company to take samples and classify them. I understand that the Great Western Mining Company was not engaged in mining operations but it was simply exploring for itself; and the Sargent Company supposed that it would be for its own benefit to know something about what was going on. All these things indicate to my mind the doing of and engaging in business. It was doing the business of handling a large property, selling lots, and seeing that the lessees lived up to their contracts. If that is not engaging in business, I do not know what is. But it is said that it was not for any gain or profit.

[2] It is said that no company comes within the operation of this act unless it is organized for profit. I do not know that it is necessary to decide exactly what that means in this case, although my present opinion is that the words "organized for profit" are used to distinguish these corporations from charitable corporations; that any corporation organized by private persons for their own advantage and interest, and not for social, charitable, or beneficent purposes, is organized for profit; and that a company organized as these companies were, to acquire title to an estate for the purpose of liquidating it and dividing the proceeds among the owners, is organized for "profit," as that term is used in the act in question. And the persons who organized these companies evidently considered it so, because when the first articles were adopted they were drawn under the provisions of the Minnesota statutes, which related to companies organized for profit.

There was considerable evidence to show that the companies themselves did not engage in the business of selling lots and did not themselves do the inspection but that such work was done and the sales were made by other companies employed by them; that the Meriden Iron Company was employed to do the inspection; and that the E. J. Longyear Company was employed to sell the lots. The fact that they employed a company to do the selling on a commission, instead of having their treasurer or manager do it, does not relieve them from the charge of doing business. The same is true with regard to this inspection work. They might have employed Warren themselves to do this work, and, if in so employing him they would be engaged in doing business, they certainly would be if they employed a company to do it. In fact, in the case of McCoach v. Minehill & Schuylkill

Haven R. R. Co., which was decided on April 7, 1913, by the United States Supreme Court, the court said:

"From the facts as stated above it is entirely clear that the Minchill Company was not, during the years of 1909 and 1910, engaged at all in the business of maintaining or operating a railroad, which was the prime object of its incorporation. This business, by the lease of 1896, it had turned over to the Reading Company. If that lease had been made without authorization of law, it may be that for some purposes, and possibly for the present purpose, the lessee might be deemed in law the agent of the lessor, or at least the lessor held estopped to deny such agency."

[3] I do not myself think that the amendment of the articles of incorporation makes any difference, so far as this case is concerned. The original articles authorized the company to engage in the business of buying and selling real estate. The amended article provides as follows:

"The general purpose of the corporation is to unite in one ownership the undivided fractional interests of its various stockholders in lands, tenements, and hereditaments, and to own such property, and, for the convenience of its stockholders, to receive and distribute among them the proceeds of any disposition of such property at such times, in such amounts, and in such manner as the board of directors may determine."

It is true that the amendment specifically mentions only receipts of the proceeds, but it authorizes the corporation to own property. The power to sell the property so that the proceeds can be received is necessarily implied by the article itself. The corporation owns the property; if it is to distribute the proceeds of a sale it must itself make the sale, for no one else can do it. This is the theory upon which the corporations have proceeded. Since the amendment the directors have taken care of the property, have sold some of it, and have done this in strict conformity with the amended article. But this question, I think, has been decided by the case of Mitchell v. Clark Iron Company, 220 U. S. 108, 31 Sup. Ct. 343. 55 L. Ed. 389. The bill alleged in that case in effect that the defendant iron company was the owner of the land described in the bill; that prior to the passage of the act in question it had leased the land; that it had done no business except to watch over and care for said lands and receive rents and royalties therefrom and distribute the same among the stockholders and such business as was necessary to defend the title. That was the allegation upon which the case was decided. The evidence in this case does not show it in any more favorable light for the plaintiffs. Upon that allegation the Supreme Court decided that the company was doing business within the terms of the act. I must therefore decide that these companies were so doing business.

Reported with the case of Flint v. Stone Tracy Company is the case of the Fifty Associates. On page 170 of 220 U. S., on page 357 of 31 Sup. Ct. (55 L. Ed. 389, Ann. Cas. 1912B, 1312), is said:

They "are operating under a charter to own real estate with power to build, improve, alter, pull down, and rebuild, and to manage, exchange, and dispose of the same."

That company was held to be doing business or engaged in business within the purpose of the act.

I have already referred to the case of McCoach v. Minehill Railroad Company and the case of United States v. Nipissing Mines Company. As I have said before, I think that they are not controlling authorities in this case, and I have come to the conclusion that these companies were, during all the times named, engaged in business so as to bring them within the operation of the act, and that it was their duty to make returns.

[4] But the next question, and to my mind the important question, is whether or not the sums of money which were received by the companies during these years as royalties and on the sales of lots were gross income within the meaning of the act. It appears from the evidence that the collector treated the gross receipts of the companies as "gross income." The question of what income was, or what depreciation was, was not raised in the case of Mitchell v. Clark Iron Company, and it was not raised in any of the cases decided at the time the case of Flint v. Stone Tracy Company was decided. The only question there, as I understand it, was whether the companies were bound to make returns. The word "depreciation" and what it means in this act are to my mind not vitally important here. I do not base my decision upon the meaning of that word, nor upon its use in the act, but rather upon the meaning which should be given to the words "gross income." Those are the words used in the act, together with the words "net income" and "earnings." The words "gross receipts" were not used in this act as they were in the case of the Spreckles Sugar Refining Co. v. McClain, 192 U. S. 397, 24 Sup. Ct. 376, 48 L. Ed. 496, nor are the words used here "deposits," as was the word used in Society for Savings v. Coite, 6 Wall. 594, 18 L. Ed. 897. What was intended by the use of the words "gross income"? What does the word "income" mean? In ordinary speech people recognize a difference between capital and income. I believe that the ordinary meaning attached to income, when it is not derived from personal exertion, is that it is something produced by capital without impairing that capital, and which leaves the property intact, and that nothing can be called income, for the purpose of this act, which takes away from the property itself. If it does, then it ceases to be income and amounts to a sale of capital assets. This definition of the word "income" I think is deducible from what was said in Flint v. Stone Tracy Company, although it is not so distinctly stated. On page 146 of 220 U. S., on page 347 of 31 Sup. Ct. (55 L. Ed. 389, Ann. Cas. 1912B, 1312), the court said:

"The income is not limited to such as is received from property used in the business strictly speaking."

That necessarily means that the property itself remains in the business and continues to be used in the business, and that income was something that was derived from the use of it, leaving the property intact. On page 165 of 220 U. S., on page 354 of 31 Sup. Ct. (55 L. Ed. 389, Ann. Cas. 1912B, 1312), the court said:

"It is no objection that the measure of taxation is found in the income produced in part from property which of itself considered is nontaxable."

It is important to notice that in that connection the court was speaking of government bonds which are not taxable. Income derived from government bonds is money derived from them without impairing the capital which produced it.

It follows necessarily from the views which I have expressed that the words "gross income" do not mean "gross receipts." It is apparent to me that gross income cannot mean gross receipts. Take, for example, the case of a mercantile corporation. It has property at the beginning of the year worth $100,000. During the year it sells at retail $10,000 of that property at what it cost. Then in the last month of the year, in December, it sells the entire property which it has left for $90,000, so that its gross receipts for the year are $100,000. It cannot be possible that such a corporation is bound to pay this tax on $100,000. Having sold $10,000 at no profit, it ought not to be subject to any taxation on that. As to the $90,000, that is money derived from a sale of capital assets. It is simply a change in the form of the capital; the merchandise has become money. If that $90,000 is taxable under this act, it can only be on the theory that Congress intended to put a tax upon the transfer of property. I do not doubt the power of Congress to do that; but, when the court decided in the Flint Case that this was a tax upon the privilege of doing business in a corporate capacity, it expressly decided that it was not a tax upon the transfer of property. I will refer again to the illustration which I have given. I will modify it by assuming that the corporation sold the $90,000 in question for $80,000; that is, that the merchandise cost it $90,000 and it sold it for $80,000. That $80,000 must figure in its gross receipts for that year. But it lost $10,000 during the year instead of making $90,000. It is perfectly apparent from the language of the act that it was never the intention of Congress to impose a tax upon a corporation that was not making money; it was never its intention to tax a losing business.

Coming to the regulations made by the Commissioner of Internal Revenue, it will be noticed that the words "gross receipts" are nowhere used in the act or in the regulations. On the contrary, the following statement is found in article 2, § 5:

"It will be noted from these definitions that gross income is practically the same as gross profits."

An examination of the rules given for the determination of the gross income of different kinds of corporations shows that it was never in the mind of the Commissioner to make the gross receipts the foundation for a determination of the gross income. In the same article 2, § 5, there is found the following:

"Sale of capital assets. In ascertaining income derived from the sale of capital assets, if the assets were acquired subsequent to January 1, 1909, the difference between the selling price and the buying price shall constitute an item of gross income to be added to or subtracted from gross income according to whether the selling price was greater or less than the buying price. If the capital assets were acquired prior to January 1, 1909, the amount of increment or depreciation representing the difference between the selling and buying price is to be adjusted so as to fairly determine the proportion of the loss or gain arising subsequent to January 1, 1909, and which proportion shall

be deducted from or added to the gross income for the year in which the sale was made."

This indicates that it is not money derived from capital that is to be taxed but only that part of it which can be in some manner determined to be profits.

That this ore in place is capital and is part of the real estate I think admits of no question. It is just as much a part of the real estate as trees standing on the land. Let us suppose that John S. Pillsbury & Co., when it owned this land with the timber still standing thereon, was a corporation; that in 1908 it sold the timber with the privilege of removing it within ten years; and that in 1909, 1910, and 1911 the purchaser cut the timber and during these years paid the purchase price of it. Could it be said that the purchase price so received was income within the meaning of this act? I do not think that it could. It was not income; it was the property itself; and, as I said before, the trees standing on the land are no more a part of the realty than is the ore under the surface of the land. They are both capital, and money derived from a sale thereof cannot be considered income, whether it be money received from the ore or money received from the timber.

There are two cases, and only two, to which my attention has been called that have passed upon this question; one is United States v. Nipissing Mines Co. (D. C.) 202 Fed. 803, where the conclusion was reached that money thus received was not income; and the other is Stratton's Independence v. Howbert, 207 Fed. 419, decided in the District Court of Colorado. Of the cases cited in the opinion only two had to do with questions of taxation.

In King v. Attwood, 6 Barn. & Cres. 277, Attwood, as the owner of a coal mine, was assessed on a rate for the relief of the poor. But the act there construed (43 Eliz. c. 2) specifically made owners of coal mines ratable. The same is true of Coltness Iron Company v. Black, 6 Law Rep. Appeal Cases, 315. Moreover, in that case it was said:

"The intention of the act, it is abundantly clear, was in Schedule A to tax 'property.' If a man had bought an estate, the tax was intended to be paid by him on the annual value of that estate, without reference to where he got it, or how he got it, or how much he paid for it. So if a man built a house or bought a house, he was intended to pay tax on the annual value of the house, no matter what it cost. Nor does anything turn upon the fact that the estate is a permanent and undecaying species of property while the house is a species of property of a less durable kind; he was intended to pay the tax upon it as long as it lasted. What, then, is the case of a mine? In the Schedule A, which is the schedule applicable to 'property,' a 'mine' is in express terms included as a species of 'property' and is made the subject of a tax."

I attach no importance to the fact that the company used the word "dividends" in making this distribution. If the money was not gross income, the fact that when they distributed it they called it dividends could not in any sense change the law as to what the real character of the money was. Nor do I attach any importance to the fact that upon the books the companies carried no "depreciation" account.

[5] I come now to the decision of the Commissioner which has been read by the District Attorney as a part of his argument. It seems to be based upon the theory that, when the Sargent Company, for example, was organized in 1906, it bought the property for $108,-000; that it was then worth much more than that sum; that this ex-cess is being received annually by way of royalties; and that the portions received in 1909, 1910, and 1911 must be considered as profits and therefore income to be taxed. The Commissioner seems to have made an attempt to apply to the case that part of the regulations heretofore quoted under the heading "Sale of Capital Assets." This property was all acquired prior to January 1, 1909. In applying the rule, it is necessary for him to determine the proportion of the gain which arose subsequent to that date. There is no evidence to show what the value of this property was at any time before the incorporation or at any time since. Yet it clearly appears that there has been no gain at all, so far as these plaintiffs are concerned, since 1909. All of the leases were made prior to that date for terms of 50 years or more. The value of the property to the plaintiffs was then fixed, and it could not be changed to their advantage during the terms of the leases. In other words, the property was worth no more to them in 1909, 1910, and 1911 than it was in 1906, 1907, and 1908. The regulation relating to income from sale of capital assets is therefore by its express terms inapplicable to this case.

But the assumption that there was any profit even in 1906 is entirely unwarranted. The only basis for that assumption is the fact that the Sargent Company was organized with a capital stock of $108,000, which it issued for the land conveyed to it, and that the land is now worth much more than that amount. It will be noticed that the amount of the capital stock was fixed at $108,000, because the smallest interest which any owner of the property had was $1/108$ part of the whole. It is perfectly apparent from the evidence that $108,000 was selected as the value of the capital without any reference whatever to the value of the property. The value of the property was not then considered, and it is apparent that it could not have been, because at that time all the leases had been made, and it was then known that the value of the property was largely in excess of $108,000. It is evident that taking $108,000 as the capital stock was a mere nominal capitalization, without any reference to value. It comes very near, in substance, as I thought when I heard the evidence, to a corporation with shares without par value, such as are allowed now by the laws of New York, as I understand. Take the illustration which I gave when Mr. Houpt was presenting his side of the case, a Bridge Company capitalized for $10,000, when the property itself cost a million dollars. Manifestly it would be most unjust to say, for the purpose of taxing the company under the act, that it had made the difference between $10,000 and the cost of the bridge simply because it had selected $10,000 as the amount of its capital stock. That sum was selected for its own convenience, without any reference whatever to the value of the property. If the Sargent Company had selected $108,000,000 as the amount of its

capital stock instead of $108,000, would these receipts be taxable under this act? Evidently not, according to the theory of the Commissioner.

This case is to be decided upon what the actual facts are and not upon what they appear to be. The actual facts are that nobody has made a dollar out of these properties by these incorporations. The evidence shows that the same persons own the stock now who owned the property before the corporations were organized. The mere change of form of ownership from that of these individuals to that of a corporation owned by the same individuals cannot produce such large profits as are claimed here.

The only conclusion that I can come to on this branch of the case is that this money was never received as gross income and cannot be in any sense called income; that it was never taxable; and that the tax on it was wrongfully collected. I assume that there is no question about the amount, so that judgments can be rendered for the amounts claimed in the complaints. I do not propose to make special findings of fact. I shall make a general finding in each one of the cases for the plaintiff and will order judgment for the amount claimed. I think, Mr. Houpt, that you should make some requests for declarations of law.

Mr. Houpt: I would rather except to the ruling of the court holding that the receipt of royalties, as shown in this case, does not constitute gross income.

The Court: Note an exception.