### APPEAL OF R. M. WAGGONER.
### APPEAL OF ADA WAGGONER.

Docket Nos. 5880, 5881.　Promulgated January 26, 1927.

1. A taxpayer lessor who keeps his books and renders his returns upon a cash receipts and disbursements basis, which method in the circumstances of this proceeding is *held* clearly to reflect income, is entitled to a reasonable allowance for depletion only upon the amount of royalties received.

2. In the circumstances of this proceeding it is *held* that a sale of an oil and gas royalty interest was consummated in the calendar year 1919, and the Commissioner's determination that the profit resulting therefrom was taxable in that year is approved.

*Harry C. Weeks, Esq.*, for the petitioners.
*Bruce A. Low, Esq.*, for the Commissioner.

The Commissioner determined deficiencies in income tax of $57,-075.22 against each of the taxpayers for the calendar year 1919. Separate appeals were filed and were consolidated for hearing and decision. The issues in both cases are the same.

The taxpayers, lessors of certain oil rights, claimed that for 1919 they were entitled to a deduction for depletion under section 214 (a) (10) of the Revenue Act of 1918 upon the basis of a total of 485,535.34 barrels of oil. The unit of depletion fixed by the Commissioner was so much per barrel of oil. Taxpayers employed the cash receipts and disbursements method of accounting in keeping their books and in reporting their income. The depletion unit of $1.50 per barrel of oil is not in controversy. In the deficiency notices the Commissioner computed the allowance for depletion upon 435,429.10 barrels, being the total amount stated in the returns. At the hearing the Commissioner repudiated his determination in this regard and claimed that, upon the basis of cash received and disbursed, taxpayers were entitled to an allowance for depletion upon only 280,523.71 barrels of oil, since they received income as royalties from this number of barrels; that if depletion is to be allowed upon 485,535.34 barrels, taxpayers' income, in order to be clearly reflected, must be computed upon the accrual basis.

The next question is whether a profit of $222,607.15 upon the sale of a three-eighths overriding royalty interest in an oil lease was realized in 1919 or 1920. The Commissioner held that the sale was consummated in 1919 and taxpayers claim that it was not completed until January 2, 1920.

### FINDINGS OF FACT.

Taxpayers are residents of Wichita Falls, Tex. During 1919 they kept their books and rendered their returns upon a cash receipts and disbursements basis. In 1919 and for some years prior thereto they owned the fee simple title to a stock farm of 521 acres near Burkburnette, Blocks 84, 85, 86 and 87, Red River Valley Lands Subdivision, in Wichita County, Texas.

Prior to and during the year 1919 certain persons held oil leases on this property from taxpayers, under which taxpayers had what is termed in the record a "one-eighth royalty interest." The lessees discovered oil on the property and the removal of oil began on April 22, 1919. Other oil leases, under which taxpayers' interests were the same as above mentioned, were given by taxpayers so that before the end of 1919 there were fifty lessees operating on the 521 acres. The lessees had tanks upon their leaseholds into which oil removed by them was run. Various oil-purchasing companies,

designated in the record as pipe-line companies, had pipe lines connected with these storage tanks through which the oil, as purchased by them, was run into their tanks. The various leases given by the taxpayers, in which their interests were fixed, are not before the Board. The oil was not measured as it was removed from the ground by the lessees and pumped into their storage tanks. Occasionally the lessees, after their tanks had been "strapped" to prevent leakage, determined the quantity of oil therein by the measurements of the tanks. During the year 1919, 3,884,272.70 barrels of the oil extracted by the lessees were sold as it was run from lessees' tanks through pipe lines of the purchasing companies into their tanks. As this oil was run through the pipe lines the purchasing company was given a document signed by the lessor and lessee, called a "division order," showing what proportion of the purchase price per barrel of the oil it should pay to the lessor and what proportion to the lessee. In this instance one-eighth of the purchase price was due the lessor, the taxpayers herein, and seven-eighths to the particular lessee. As the oil was run through the pipe lines of the purchasing company it was carefully measured. The lessee was required to furnish the purchasing company with an abstract of the property from which the oil had been extracted before it purchased the same. The purchasing companies paid or credited the lessor or the lessee with the respective amounts due them. The average sale price of the oil sold in 1919 was $2.25 a barrel. Under the "division order" given a purchasing company by the lessors and the various lessees, the taxpayers were due payment from the purchaser of one-eighth of the purchase price of the 3,884,272.70 barrels, which amount represented the sales price of 485,535.34 barrels of oil. The lessors had no information of the amount of oil extracted by the various lessees, other than as shown by the statements furnished them by the purchasing companies. The lessors made no effort at the end of 1919 to determine the quantity of unsold oil, if any, in the tanks of the lessees.

During the year 1919 taxpayers received payments on account of the amounts due them by the purchasers of the oil above mentioned, totaling $631,178.35 and representing the average selling price of $2.25 a barrel for the 280,523.71 barrels, which amount they entered upon their books and reported in their income-tax returns as income from royalties received within the year. The amount of income during the taxable year from royalties was not made an issue in the pleadings, nor was any question concerning this raised at the hearing. At the time of making the returns, the computation of the bookkeeper for the taxpayers, based upon statements which he then found had been received from the purchasing companies, showed

that the taxpayers' " one-eighth royalty interest " in the oil sold represented 435,429.10 barrels, and this number of barrels was shown in the returns as the basis for the depletion allowance under section 214 (a) (10) of the Revenue Act of 1918. The Commissioner in determining the depletion allowance of these taxpayers for 1919 used a depletion rate of $1.50 a barrel, which was the unit measurement for the purpose of determining the depletion allowance. Neither the basis nor the unit rate for depletion is in controversy in these appeals. In his deficiency notices the Commissioner computed the allowance for depletion upon the 435,429.10 barrels shown in the returns, but in his answer to the petitions and at the hearing he contended that his determination in this regard was erroneous because (1) the taxpayers employed the cash receipts and disbursements method of accounting and in reporting income, and they were therefore only entitled to an allowance for depletion for 1919 computed at $1.50 per barrel upon 280,523.71 barrels of oil for which they received income during 1919 and not upon 435,429.10 barrels, and (2) that if the Board should conclude that the taxpayers were entitled to depletion computed upon the basis of the number of barrels of oil for which the purchaser was indebted to them, but for which they had not received payment, their income should be computed upon the accrual basis and the accounts receivable reflected in income.

Some of the purchasing pipe-line companies followed the practice of paying for oil run into their tanks from the 1st to the 15th of the month, on the 25th of the same month, and for all oil run from the 15th to the end of any month, on.the 10th of the month following. Other purchasers followed the practice of paying for all oil run during any month on the 10th of the following month.

Prior to November 26, 1919, these taxpayers, together with Clois L. Greene, owned a three-eighths overriding royalty interest in an oil and gas lease on 20 acres of land in Block 86, Red River Lands Subdivision, in Wichita County, Texas. At that time R. M. Waggoner and his wife owned the fee simple title to the property. They had previously made an oil and gas lease by virtue of which the lessee became entitled to seven-eighths and the taxpayers to one-eighth of the oil produced. Waggoner and Greene acquired the title to this lease, selling thereafter in July, 1919, an interest to David Livingston, by which Livingston became obligated to operate and develop the property at his own cost and expense, and entitled to receive therefrom four-eighths of all the oil produced, the remaining three-eighths being delivered to Waggoner and Greene without cost or expense to them. This three-eighths interest of Waggoner and Greene in the oil produced without expense to them was termed

an "overriding royalty." Between July and November 26, 1919, Livingston sold to the Charles F. Noble Oil & Gas Co. an interest in and to the four-eighths interest which he had acquired, this interest being commonly referred to as the "working interest," and on and prior to November 26, 1919, the Charles F. Noble Oil & Gas Co. was in possession of these 20 acres, developing the same and producing oil therefrom. This company had a pipe line through which it transported all the oil produced from these 20 acres to a refinery owned and operated by it. It was the established custom in sales of this kind for the seller to furnish the purchaser with an abstract of title to the property involved in the interest sold. The sale to Livingston above referred to had been made for a consideration of $125,000—$50,000 in cash and $75,000 to be paid from one-half of the proceeds of the four-eighths of the oil going to Livingston and produced from said property, so that on November 26, 1919, Noble & Company was in possession and operating the property and was also receiving into its pipe lines all of the oil produced therefrom. They were crediting one-eighth of this oil to R. M. Waggoner as his royalty; three-eighths to Waggoner and Greene as their overriding royalty; two-eighths to Waggoner and Greene upon their deferred payment, and the remainder of the working interest to Livingston and Noble & Company. Noble & Company did not make payment to Waggoner and Greene or R. M. Waggoner in 1919 for any of the oil produced from the property either before or after November 26, 1919. This included the deferred payment due them upon the Livingston sale, as well as Waggoner's one-eighth royalty and the three-eighths overriding royalty.

As a result of a conference between Waggoner, Greene, their attorney, and Charles F. Noble, president of Noble & Company and the attorney for the company, held on November 26, 1919, at Tulsa, Okla., a written agreement was entered into between Waggoner and Greene, as parties of the first part, and Charles F. Noble Oil & Gas Co., as party of the second part, and Charles F. Noble, party of the third part. (Charles F. Noble was a party to the agreement because he was a guarantor of the obligation hereinafter referred to, and for the further reason that at that time the company had not been domesticated in Texas and did not desire to appear as doing business in that State.)

Waggoner and Greene contracted to sell to Noble & Company the three-eighths royalty interest in the property above referred to for $500,000, and the following contract was executed:

This Agreement entered into this 26th day of November A. D. 1919, by and between R. M. Waggoner and Clois L. Greene, both of Wichita County, Texas, hereinafter styled parties of the first part and Charles F. Noble Oil & Gas

Company, a corporation hereinafter styled party of the second part and Charles F. Noble of Tulsa County, Oklahoma, hereinafter styled party of the third part.

WITNESSETH : that for the considerations hereinafter shown, parties of the first part have sold and agreed to transfer, assign, and deliver, under the terms and conditions hereinafter specified, and party of the second part has purchased and agrees to accept and pay for, under said terms and conditions, the following described property to-wit:

A three-eighths royalty interest in all the oil produced from the following described land to-wit: the south 20 acres of the North 35 Acres of Block No. 86 Red River Valley Lands Subdivision in Wichita County, Texas and being the same royalty interest retained by parties of the first part in an assignment made by them to David Livingston on May 29th, 1919, which assignment is duly recorded in Volume 133, pages 415 and 416 Deed records of Wichita County, Texas, to which records reference is hereby expressly made for all purposes.

The consideration to be paid for said assignment and for said property is $500,000.00, which shall be paid as follows: $150,000.00 in cash upon approval of the abstract, as hereinafter provided and the balance in three deferred payments, one for $150,000.00 due on or before March 1st, 1920, one for $100,000.00 due on or before June 1st, 1920, and the last for $100,000.00 due on or before September 1st, 1920, said deferred payments shall be evidenced by note in the amount and due as above stated, said notes to bear even date herewith, and to draw interest from date until paid at the rate of 7% per annum and to contain the usual optional maturity and attorney's fee clauses and to be secured by vendor's lien upon the property conveyed.

The assignment to said property shall be in the form and shall contain the terms, stipulations and conditions set forth in a copy of an assignment this day executed by parties of the first part to party of the third part, a copy of which is attached hereto, marked " Exhibit A" and made a part hereof for all purposes.

Within fifteen days from the date thereof, parties of the first part shall furnish to party of the second part, a complete abstract of title to the real estate above described and party of the second part shall have one week within which to examine said abstract, if at the end of said one week period, said abstract does not show good and merchantable title to the interest in said property to be conveyed hereunder in parties of the first part, then party of the second part shall furnish parties of the first part, at Wichita Falls, Texas, with a written statement of the defects in said title and all defects not therein pointed out, shall be deemed waived. If defects are pointed out, parties of the first part shall have two weeks from the end of said one week period, within which to cure said defects and they hereby bind and obligate themselves to use every reasonable effort so to do, it being understood and agreed that if said defects are cured, at the end of the two weeks period above allowed for curing defects in title, then the purchase and sale herein provided for, shall at once be consummated, otherwise, this agreement shall be of no force and effect and all moneys posted hereunder, shall be forthwith returned to the party posting the same and all liabilities hereunder shall cease and terminate.

It is understood and agreed in this connection, that the assignment above provided for is made to party of the third part; that this is done for convenience and that party of the third part is to hold said property for the use and benefit of party of the second part and that party of the second part is the real purchaser and is primarily obligated by reason of this contract and that the

notes herein provided for are the primary obligation of party of the second part and that the liability of party of the third part thereon and hereby is as endorser and surety.

A copy of this contract together with an assignment properly executed and acknowledged by parties of the first part in the form herein provided for covering the property above described and .said three notes executed by parties of the second and third part to parties of the first part and the sum of $150,000.00 in cash shall be at once placed in escrow in the Wichita State Bank and Trust Company in Wichita Falls, Texas and be held by them subject to the following: If the conditions herein contained as to title are complied with, then said sum of money and said notes, shall be delivered forthwith to parties of the first part and said assignment to party of the second part, otherwise, said notes and said money shall be returned to party of the second part, the assignment to parties of the first part, and all obligations hereunder shall cease and terminate.

And for the sum of $10.00 and other considerations to him in cash paid, receipt of which is hereby acknowledged and confessed party of the third part hereby guarantees unto parties of the first part, the prompt and faithful performance of this agreement and the prompt payment of said notes by party of the second part.

This agreement shall extend to and be binding upon the respective heirs, successors and assigns of the parties hereto.

Witness the hands of the parties hereto in triplicate this day and year above written.

(Signed)          R. M. WAGGONER,
                  CLOIS L. GREENE,

*Party of the first part.*

CHARLES F. NOBLE OIL & GAS COMPANY,
By CHAS. F. NOBLE, *Pres.*,

*Party of the second part.*

CHARLES F. NOBLE,

*Party of the third part.*

The foregoing contract consummated agreeably to all parties concerned this 2nd day of January, A. D. 1920.

(Signed)          WAGGONER & GREENE,
                  By HARRY C. WEEKS.
                  CHAS. F. NOBLE.

On the date the contract was executed an assignment, referred to therein as Exhibit A, from Waggoner and Greene was also executed by Waggoner and Greene. This assignment, dated and acknowledged November 26, 1919, was as follows:

WHEREAS, heretofore, on the 27th day of January, 1919, R. M. Waggoner and his wife, Ada Waggoner, executed and delivered to J. P. Cantrell & Wm. M. Marseilles an oil and gas lease and leasehold estate covering the North 25 acres of Block 86, Red River Valley Land Subdivision in Wichita County, Texas, as fully appears from said lease contract, which is of record in the deed records of Wichita County, Texas, reference to which is here made and

WHEREAS, on the 27th day of January, A. D. 1919, R. M. Waggoner and his wife, Ada Waggoner, executed and delivered to Clois L. Greene and C. F. Wilson, an oil and gas lease and leasehold estate in and to the South 25 Acres of the North 50 Acres of Block 86, Red River Valley Land Subdivisions in

Wichita County, Texas, as fully appears from said lease contract of record in the deed records of Wichita County, Texas, reference to which is here made; and

WHEREAS, both of said oil and gas leases above described in so far as same pertains to the following described land to-wit: the South 20 Acres, of the North 35 Acres of Block 86 Red River Valley Land Subdivision in Wichita County, Texas, were transferred and assigned to Clois L. Greene and R. M. Waggoner and whereas afterward to-wit: On the 29th day of May, A. D. 1919, the said Clois L. Greene and R. M. Waggoner, sold, transferred and assigned said oil and gas leases insofar as same pertains to the 20 acre tract above described, to David Livingston and did in same transfer and assignment, retain unto themselves an over-riding royalty of three-eighths of all of the oil produced from said 20 Acre tract, which assignment is duly recorded in Volume 133, Pages 415 and 416, deed records of Wichita County, Texas to which record reference is expressly made for all purposes.

Now therefore know all men by these presents, that we the said Clois L. Greene and R. M. Waggoner both of Wichita County, Texas, the present legal and equitable holders and owners of said royalty interest above referred to, for and in consideration of the sum of $500,000.00 to us paid and secured to be paid by Charles F. Noble of Tulsa, Oklahoma, as follows: $150,000.00 in cash paid receipt of which is hereby acknowledged and confessed and the balance in three deferred payments due as follows: to-wit: $150,000.00 on or before March 1st, 1920, $100,000.00 on or before June 1st, 1920, $100,000.00 on or before September 1st, 1920, for which deferred payments the said Charles F. Noble has executed his three promissory notes all of same bearing even date herewith, in the amounts and due as above set forth, all of said notes bearing interest from date until paid at the rate of 7% per annum and all of said notes containing the usual optional maturity and attorney's fee clauses, and being secured by vendor's lien upon the property conveyed hereby.

Have bargained, granted sold and conveyed and by these presents do bargain, grant, sell and convey unto the said Charles F. Noble of Tulsa, Oklahoma, all of the three-eighths royalty retained by grantors in the assignment to David Livingston above referred to.

To have and to hold the property and estates above conveyed together with all and singular the rights and appurtenances thereto in any wise belonging to the said Charles F. Noble, his heirs and assigns forever, subject however, to all of the terms and conditions in the original leases contained, and to the further terms and conditions hereof.

It is understood and agreed between the parties to this conveyance, that all of the oil produced from the 20 Acre tract above described, which would otherwise go to grantors by virtue of said three-eighths royalty interest from and including November 27th, 1919, shall go to grantee herein, but this conveyance shall not affect the rights of grantors to their portion of the oil in storage on said lease up to November 27th, 1919, or the oil run from said property prior to that date, and it is further agreed and understood that this conveyance shall not in any manner affect the one-eighth royalty going to the said R. M. Waggoner, by reason of his ownership of the land covered by the leases above referred to, nor any of his rights by virtue of such ownership.

AND it is further agreed and understood between the parties hereto that this conveyance shall not in any manner affect the payment of the $75,000.00 deferred payment described in the conveyance from grantors herein to David Livingston above referred to and that regardless of this assignment, said

payment shall be due in the same way and grantors shall have the same security and the same right to enforce payment as if this conveyance had not been made.

AND it is expressly agreed and stipulated that the vendor's lien is retained against the property premises, and estates conveyed hereby until the above described notes together with all interest thereon due, are fully paid according to their face, tenor, effect and reading, whereupon this conveyance shall become absolute.

WITNESS the hands of the grantors herein this 26th day of November, A. D. 1919.

R. M. WAGGONER.
CLOIS L. GREENE.

The profit resulting to R. M. Waggoner from this sale was $222,607.15.

The contract of conveyance, the three notes, the check for $150,000, which was endorsed by Waggoner and Greene, and an agreement for the optional maturity of the notes in the event of failure of the maker to pay any one at maturity were, on November 26, 1919, delivered by the respective parties to the attorney for Waggoner and Greene, to be by him placed in escrow in the Wichita State Bank & Trust Co. at Wichita Falls in accordance with the terms of the contract. The instruments mentioned were delivered to the said bank on November 28, 1919, and the president of the bank executed his receipt therefor. The check for $150,000 was cashed by him and the proceeds held.

On and after November 27, 1919, Noble & Company continued to extract oil " from the " property, retaining the three-eighths interest specified in the contract and assignment which had theretofore been credited to Waggoner and Greene. No portion thereof was credited to Waggoner and Greene after November 26.

An abstract of title to the property was furnished Noble & Company at some time prior to December 20, 1919, the exact date not being disclosed by the record. This abstract, consisting of approximately 150 pages, was not brought down to November 26, 1919, but showed all conveyances prior to September 4, 1919. On December 20, 1919, the attorney for Noble & Company advised the attorneys for Waggoner and Greene by letter as follows:

I have received and examined the abstract of title covering among other lands the south 20 acres of the north 35 acres of Block 86, Red River Valley Lands Subdivision in Wichita County, Texas, and find that this abstarct is continued down to the fourth day of September—1919.

We request that a supplement of this abstract continued down to the twenty-sixth day of November, 1919, be furnished us that we may examine the records of transfer made subsequent to September 4th, 1919.

The supplemental abstract showing all conveyances to December 26, 1919, was furnished Noble & Company on or about December 27, 1919. The completed abstract so furnished showed good and mer-

chantable title in and to the property conveyed. On January 2, 1920, Charles F. Noble appeared at the office of the attorney of Waggoner and Greene and announced his willingness to release the escrow agreement and deliver the purchase price to Waggoner and Greene. The attorney for Waggoner and Greene went with him to the bank where the papers and money had been placed in escrow and the following notation was made upon the sales contract signed by Waggoner and Greene by their attorney and Charles F. Noble:

The foregoing contract consummated agreeable to all parties concerned, this 2nd day of January, 1920.

The contract of conveyance was delivered to Noble and the $150,-000 cash was deposited to the credit of Waggoner and Greene in the Wichita State Bank & Trust Co., and the notes for $350,000 were held by the bank for Waggoner and Greene.

OPINION.

LITTLETON: Taxpayers claim (1) that they together, as lessors, are entitled to an allowance for depletion for 1919 of $728,303.01, computed at $1.50 a barrel on 485,535.34 barrels of oil, and (2) that the sale of certain oil and gas interests to Noble & Company was not consummated and completed until 1920 and there was therefore no taxable gain from that source in 1919.

During the taxable years taxpayers kept their books and rendered their returns upon the cash receipts and disbursements basis, and they had large income from various sources other than from royalties and from the alleged sale to Noble & Company.

The Commissioner contends (1) that the reasonable allowance for depletion to which these taxpayers were entitled for 1919 should be computed upon the basis of $1.50 on 280,523.71 barrels of oil, if their income is to be determined upon the cash receipts and disbursements basis; (2) that if they are to be allowed depletion upon the basis of the 485,535.34 barrels, or on any amount in excess of the 280,523.71 barrels, their income, in order to be clearly reflected, should be determined upon the accrual basis; and (3) that upon either the accrual or the cash receipts and disbursements basis his determination that the profit of $222,607.15 on the transaction was realized in 1919 should be approved.

Section 214 (a) (10) of the Revenue Act of 1918 provides:

(a) That in computing net income there shall be allowed as deductions:

*       *       *       *       *       *       *

(10) In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case, based upon cost including cost of development not otherwise deducted: *Provided*, That in the

case of such properties acquired prior to March 1, 1913, the fair market value of the property (or the taxpayer's interest therein) on that date shall be taken in lieu of cost up to that date: *Provided further,* That in the case of mines, oil and gas wells, discovered by the taxpayer, on or after March 1, 1913, and not acquired as the result of purchase of a proven tract or lease, where the fair market value of the property is materially disproportionate to the cost, the depletion allowance shall be based upon the fair market value of the property at the date of the discovery, or within thirty days thereafter; such reasonable allowance in all the above cases to be made under rules and regulations to be prescribed by the Commissioner with the approval of the Secretary. In the case of leases the deductions allowed by this paragraph shall be equitably apportioned between the lessor and lessee.

The purpose of the depletion provision of the statute is to return to the taxpayers having an interest in oil properties through the aggregate of annual depletion allowances, the basis of the depletion allowances, that is, the cost or the value on March 1, 1913, or the value of the oil in place at the date of discovery or within thirty days thereafter, before any income therefrom during the year shall be subjected to tax. These taxpayers employed the cash receipts and disbursements method of accounting, and in view of this and other facts disclosed by the record, we are of the opinion that the reasonable allowance to which these taxpayers were entitled for the year 1919 should be computed upon the basis of the royalty income received within the year. It is only in this manner that taxpayers employing the cash receipts and disbursements method of reporting income can get the full benefit of the provision of section 214 (a) (10) for, if a taxpayer employing such a method of accounting should for any reason receive no royalties from such source and had no other income from which to take the deduction of the allowance for depletion, he would receive no benefit from the statute; and if he should receive in a subsequent year his royalties, as the facts show was true in the case of these taxpayers, he would be required to pay a tax upon the entire amount thereof. The tax is an annual tax and the deductions are annual deductions and it is the intent and purpose of the statute that income and deductions shall be treated consistently. *United States* v. *Anderson,* 269 U. S. 422; *United States* v. *Mitchell,* 271 U. S. 9; *Appeal of Consolidated Asphalt Co.,* 1 B. T. A. 79; *Appeal of Henry Reubel,* 1 B. T. A. 676. Royalties are income. *Sargent Land Co.* v. *Von Baumbach,* 207 Fed. 423; 219 Fed. 31; 242 U. S. 503; *Alworth-Stephens Co.* v. *Lynch,* 278 Fed. 959; 294 Fed. 190; 267 U. S. 364. In the last mentioned case depletion was allowed the lessor under the provisions of the Revenue Act of 1916 upon the basis of the value of its interest in the mineral rights and the royalties received within the year.

The leases under which these taxpayers were entitled to royalties are not before the Board, and the facts contained in the record show

that these taxpayers received royalties amounting to $631,178.35. The taxpayers claimed that because the lessees removed from the leased premises and sold during the year 3,884,272.70 barrels of oil and that under the terms of the leases and the " division order " they had a " one-eighth royalty interest," (whatever that may mean), they were entitled to an allowance for depletion computed upon one-eighth of this number of barrels, or 485,535.34 barrels, notwithstanding they only received royalties to the extent of $631,178.35, the equivalent of the sales price of 280,523.71 barrels of oil. The only basis for their contention is that the Commissioner's regulation provides that depletion in the case of oil shall be computed by applying the depletion unit, in this case $1.50 a barrel, to all oil produced within the year, and that such regulation is binding upon the Commissioner and the Board. These taxpayers were not engaged in producing oil. They only received royalties. It is apparent from the argument of the Commissioner in this case that the allowance for depletion to lessors should be upon the basis of the royalty income received, that he does not construe his regulation as taxpayers contend. The Board does not construe the regulation in the manner contended for by the taxpayers and therefore fails to find merit in their contention. Article 210, Regulations 45, provides as follows:

(a) Depletion attaches to the annual production "according to the peculiar conditions of each case" and when the depletion actually sustained, whether legally allowable or not, from the basic date, equals the cost or value on the basic date plus subsequent allowable capital additions, no further deductions for depletion will be allowed except in consequence of added value arising through discovery or purchase. * * *

(b) When the value of the property at the basic date has been determined, depletion for the taxable year shall be determined by dividing the value remaining for depletion by the number of units of mineral to which this value is applicable, and by multiplying the unit value for depletion, so determined, by the number of units sold within the taxable year. In the selection of a unit for depletion preference shall be given to the principal or customary unit or units paid for in the product sold.

These Regulations further provide, in article 215 (b), that—

* * * Where the owner has leased a mineral property for a term of years with a requirement in the lease that the lessee shall extract and pay for, annually, a specified number of tons, or other agreed units of measurement, of such mineral, or shall pay, annually, a specified sum of money which shall be applied in payment of the purchase price or royalty per unit of such mineral whenever the same shall thereafter be extracted and removed from the leased premises, the value in the ground to the lessor, for purposes of depletion, of the number of units so paid for in advance of extraction will constitute an allowable deduction from the gross income of the year in which such payment or payments shall be made; but no deduction for depletion by the lessor shall be claimed or allowed in any subsequent year on account of the extraction or

removal in such year of any mineral so paid for in advance and for which deduction has once been made.

Even if the Regulations could be construed as permitting the deduction of an allowance for depletion to a lessor receiving royalties and employing the cash receipts and disbursements basis of accounting on units of measurement in excess of that on which such lessors received income from royalties, it might be seriously doubted if such a method would be a proper interpretation of the statute. The Commissioner has held that a lessor of mining property who waived his rights to royalties for several years and received all of the royalties in 1917 was entitled, since he submitted his returns for those years on the cash receipts and disbursements basis, to deduct from income received in 1917 such depletion allowance as appertained to that income. See A. R. M. 17, C. B. No. 2, p. 144. We think this holding applied the correct principle and followed the intendment of the statute. All that the statute provides is that in computing net income there shall be allowed as a deduction a reasonable allowance for depletion " according to the peculiar conditions in each case," and this reasonable allowance must be determined in the light of the provisions of sections 212 and 213 of the Act defining gross and net income.

As stated hereinbefore, the leases are not before us and we do not know just what they provided regarding the payment of royalties. The evidence shows that the oil was extracted by the lessees and run into their tanks located upon the leased premises; that they had possession of the oil until it was run through the pipe lines and sold to others. At the time of the sale the purchaser was given some kind of a written document signed by the lessor and the lessee to the effect that the taxpayers, lessors, were to be paid one-eighth of the purchase price of the oil. The purchaser thereupon paid or credited taxpayers with that amount and they reported as royalties received that portion of the one-eighth of the selling price received by them during the year 1919. The number of barrels of oil upon which taxpayers claim an allowance for depletion, to wit, 485,535.34, represented one-eighth of the total number of barrels of oil sold to the pipe-line companies during the year.

We are not deciding the question whether if a lessor under the terms of a lease receives instead of cash a certain proportion of the oil produced by the lessees he thereupon receives taxable income. That question is not before us, and, if it were, the evidence in this case is insufficient to enable us to decide it. All that we decide in connection with the issues presented is that upon the facts in this case these taxpayers received royalties to the extent of $631,178.35 and that upon the unit of measurement for the purpose of computing

the depletion deduction they were entitled to depletion from 280,-523.71 barrels of oil.

In view of our conclusions in respect of the depletion allowance, it may not be said that the cash receipts and disbursements method of accounting employed by these taxpayers did not clearly reflect their income.

Waggoner and Greene unconditionally sold their three-eighths interest in a certain oil and gas well on November 26, 1919. All that remained to be done before they became unconditionally entitled to receive the $500,000 placed in escrow was for them to furnish an abstract showing good and merchantable title to the property sold. Beyond this provision the transaction was in all other respects a completed sale on November 26, 1919. Waggoner and Greene were given fifteen days from November 26 within which to furnish abstract of title to the property. This period expired on December 11, 1919. Noble & Company were given one week thereafter, or until December 18, within which to examine the abstract and point out any defects therein. Waggoner and Greene were then given an additional two weeks, or until January 1, 1920, within which to cure any defects pointed out. At some date prior to December 20, 1919, an abstract was furnished in which, so far as the period which it covered is concerned, the attorney for Noble & Company found no defect. On December 20, 1919, he requested that a supplemental abstract covering the period from September 4, the last date covered by the first abstract furnished, to November 26, 1919, be furnished him. This supplemental abstract was furnished on or about December 27, 1919, and showed good and merchantable title. The conveyance specifically provided that Waggoner and Greene should furnish the abstract within fifteen days; that Noble & Company should have one week thereafter in which to point out any defects in the title; that, if any defects were pointed out, Waggoner and Greene should then have two weeks from the end of the said one-week period to cure such defects in the title as might have been pointed out, and that upon such defects being cured the purchase and sale should at once be consummated. The effect of this provision was that since Waggoner and Greene had furnished an abstract showing good and merchantable title the sale should become absolute. The completed abstract of title was not furnished within the fifteen days, nor were any defects pointed out by Noble & Company within one week after the expiration of the fifteen days specified or at any time thereafter. The first abstract furnished by Waggoner and Greene was satisfactory to Noble & Company as far as it went. The only defect pointed out was that the abstract was not complete and a supplemental abstract was asked for, which was furnished

on or about December 27, 1919, showing a good and merchantable title to the interest in the property conveyed. This was after the expiration of the fifteen days allowed Waggoner and Greene for furnishing the abstract and also beyond the period of one week allowed Noble & Company within which to examine the abstract. The time for furnishing and for the examination of the abstract was never extended, and in our opinion the sale became completed and consummated on December 27, 1919, when the complete abstract showing good and merchantable title in Waggoner and Greene was furnished to Noble & Company. Under the provisions of the conveyance Noble & Company did not have a period of one week from December 27, 1919, within which to examine the contract before the sale should become consummated. On that date Waggoner and Greene, having furnished an abstract showing good and merchantable title as required by the conveyance, could have demanded and enforced the delivery of the $500,000 purchase price, and it would have been incumbent upon Noble & Company to show that their title to the property conveyed was imperfect. This, according to the evidence, it could not have done. After the time specified in the conveyance within which the abstract should be furnished and examined had expired, no modification of the provision having been made by the parties, the furnishing of the abstract showing good and merchantable title in the sellers consummated the sale, and the taking effect of the sale so as to postpone the realization by the sellers of the profit thereon could not be postponed by the delay of Noble & Company in notifying the escrow agents that the escrow agreement had been complied with.

The purpose of Waggoner and Greene from the beginning was to postpone the realization of the profit on the sale of their three-eighths interest until the year 1920. We think that they have failed in their attempt to accomplish this. In the opinion of the Board the sale became a completed one on December 27, 1919.

The consideration received for the property consisted of $150,000 in cash and three interest-bearing promissory notes executed by the Charles F. Noble Oil & Gas Co., one for $150,000 due March 1, 1920, one for $100,000 due June 1, 1920, and one for $100,000 due September 1, 1920.

The Commissioner held that the profit on the sale was realized in the year 1919, that the promissory notes were the equivalent of cash, and that Waggoner's profit on the transaction was $222,607.15. The taxpayer stated " the agreed consideration was $500,000, of which one-half was to go to Waggoner. The profit of these taxpayers in this transaction is admittedly $222,607.15. The question at issue is

the year in which the profit is to be reported." In the opinion of the Board the Commissioner's determination that the profit was realized in 1919 was correct and is approved.

> Judgment will be entered on 20 days' notice, under Rule 50.

MILLIKEN not participating.

ARUNDELL, PHILLIPS and TRAMMELL dissent from the decision reached on the last issue discussed.